# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00416-CR

**Felix Sandoval, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 428TH JUDICIAL DISTRICT
### NO. CR-11-0225, THE HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## O P I N I O N

A jury convicted appellant Felix Sandoval of the offense of sexual assault of a child, *see* Tex. Penal Code § 22.011(a)(2)(A), and assessed his punishment, enhanced by a prior felony conviction, at confinement for 80 years in the Institutional Division of the Texas Department of Criminal Justice. *See id.* §§ 22.011(f) (categorizing offense as second degree felony), 12.42(b) (providing that at trial of second degree felony offense, defendant shall be punished for first degree felony upon proof of previous felony conviction), 12.32 (punishment range for first degree felony is imprisonment for life or any term not more than 99 years or less than 5 years). In nine points of error on appeal, appellant complains about the removal of a juror during deliberations, the admission of hearsay evidence, the admission of improper opinion testimony, and the admission of character-conformity evidence. For the following reasons, we reverse appellant's conviction and remand the cause to the trial court for a new trial.

**BACKGROUND**

The record reflects that on July 14, 2010, the victim, C.E., turned 15 years old.[1]

Appellant was married to C.E.'s aunt, and occasionally C.E. spent the night in their home to visit

their daughter, C.E.'s younger cousin. In November 2010, C.E. disclosed to another cousin, B.E.,

that on one overnight visit earlier that year appellant forced her to have sexual intercourse with him.

The cousin got her father, C.E.'s uncle, and had C.E. repeat the information to him. He, in turn, got

C.E.'s mother and had C.E. tell her mother. C.E.'s mother, Rosie, reported the incident to police the

following day.[2]

Daniel Preston, a patrol officer with the City of Kyle Police Department, responded

to a dispatch call concerning C.E.'s complaint of sexual assault. He met with C.E. and her mother

at the police station, where he interviewed them and took written statements from both of them.

During the officer's testimony at trial, the written statements of both C.E. and Rosie were admitted

for the limited purpose of showing what information the officer acted on. In order to "minimize any

perceived prejudice to the defendant," the trial court ordered that the statements not be published to

the jury until C.E. and her mother testified.

Officer Preston testified that C.E. and her mother both told him that appellant had

sexually assaulted C.E. the preceding summer when C.E. spent the night at his house to visit her

younger cousin. In his testimony, the officer repeated the details of C.E.'s account of the alleged

---

[1] In order to protect the identity of the minor children involved in this case, we use only the initials of the victim and other children and only the first names of adult family members.

[2] There is some confusion in the record about the spelling of Rosie's full first name. However, the record reflects that she goes by "Rosie," which is how we will refer to her in this opinion.

sexual assault. According to the information he received, C.E. spent the night at her aunt's house one night between mid-July and mid-August 2010. The next morning, her aunt and cousin left to go to the store, but C.E. remained behind to sleep some more. After her cousin left, C.E. locked the bedroom door and returned to bed. She then heard appellant repeatedly knocking on the door seeking entrance. C.E. refused to open the door, telling him to go away. She got up out of bed and went to sit on a couch by the window to await her aunt's return. However, appellant somehow unlocked the door and entered the bedroom. According to C.E.'s report to the officer, appellant then came toward her and began hugging her and kissing her on the mouth. C.E. told the officer that she moved her head from side to side to avoid the kisses and told him to stop. She said that appellant then threw her on to the bed and when she attempted to get up he pushed her back down on the bed. They struggled over her sweat pants—when appellant repeatedly attempted to remove them she kept pulling them back up—until he managed to remove them completely after he grabbed her hands. She reported that when he held her hands, it caused her pain. C.E. told Officer Preston that appellant inserted his penis into her vagina as she continued to struggle and fight. She said that appellant had intercourse with her for approximately five minutes and then stopped. He told her not to tell anyone about what had happened and then took his clothes and went into the bathroom. When her aunt and cousin returned, C.E. pretended nothing had happened. She did not say anything until November 14 of that year, when she revealed the assault to her 15-year-old cousin. In his testimony, the officer confirmed that what C.E. told him was "in line" with what her mother told him had happened.

The officer also testified that during his interview of C.E., she gave a description of a tattoo on appellant's upper arm. During questioning on redirect examination, the State showed Officer Preston a photograph of a tattoo on appellant's arm taken during his jail book-in, and the

3

officer opined that it matched the description C.E. gave him. In addition, Officer Preston described the clothing that C.E. reported appellant had been wearing at the time of the assault—a white t-shirt and camouflage shorts. The officer also said that C.E. indicated that she did not report the assault sooner because she was scared. He further testified that C.E.'s written statement comported with what she had told him in the interview and, further, that he "didn't find any glaring discrepencies or inconsistencies . . . that would raise red flags." After taking the report, he forwarded the case to the Criminal Investigation Division.

Pedro Carrasco, a detective with the Kyle Police Department, was assigned to investigate the case. He set up a forensic interview of C.E. at the local child advocacy center. As part of his investigation, he reviewed the video of the interview.[3] He opined in his testimony at trial that C.E.'s forensic interview was consistent with both the written and oral statements C.E. had provided Officer Preston. He also explained that in her forensic interview C.E. described a tattoo on appellant's left arm. After being shown a photograph of appellant's tattoo by the prosecutor, he opined that it matched the description C.E. gave to the interviewer. Detective Carrasco also testified that he had not observed anything in C.E.'s forensic interview that indicated to him that she had fabricated the allegations.

The detective also testified that, as part of his investigation, he made contact with appellant, who agreed to come in to the police station for a voluntary interview.[4] During the

---

[3] The record reflects that law enforcement officers are able to watch the forensic interviews in a separate room at the advocacy center while they are being conducted. However, Detective Carrasco was not present to observe C.E.'s interview live.

[4] According to his testimony, the detective first made contact with appellant at his house. Initially, appellant hid inside the house while his wife answered the door and told the detective he was not at home. Feeling that appellant was inside, Detective Carrasco explained that appellant was

interview, appellant recalled the night that C.E. spent the night at his house that summer, and he remembered that his wife had left the house for 10 to 15 minutes and then returned. Throughout the interview, appellant repeatedly denied committing the offense and expressed that "[he was] not a molester." He indicated that he did not know C.E.'s motives for falsely accusing him, but offered several possible reasons for the accusation, including the family's dislike of him. At the end of the interview, appellant offered to give a DNA sample and, after the detective's request, indicated that he would consider taking a polygraph test. However, the detective had no further communications with appellant after the interview. The video recording of the interview was admitted into evidence, in its entirety, and played for the jury during the detective's testimony.[5]

---

not in trouble and that he just needed to talk to him. Appellant's wife then went inside the residence, and shortly thereafter appellant came to the door. The detective testified that he found appellant's reluctance to come to the door and his wife's lying for him "significant."

[5] The video of the interview began with a discussion about appellant's prior incarceration for aggravated assault and his explanation about the circumstances of that offense. During the interview, the detective mentioned "another incident . . . about [J.A.] [C.E.'s older sister]" that implied inappropriate conduct, to which appellant made no response. The interview ended with a discussion about taking a polygraph exam, during which appellant mentioned hiring a lawyer. Defense counsel objected to the admission of these portions of the video and asked that the video be redacted. The State opposed redaction.

The State first offered the video when defense counsel began to cross-examine the detective about the interview. The prosecutor objected to questions about specifics of the interview and offered the video in its entirety "under the Doctrine of Optional Completeness." The objection was overruled. A few questions later, the State again objected and again offered the video. The objection was again overruled, but defense counsel pursued the State's willingness to admit the video. However, the prosecutor explained that her agreement to the admission of the video was conditioned on its admission in its entirety, unredacted, stating, "The whole kit and caboodle. If it comes in, it comes in as is." When defense counsel objected to that, she expressed that "[h]e doesn't get to pick and choose." At that time, the trial court took the arguments under advisement and made no ruling concerning the redaction of the objected-to content. Later, when defense counsel continued to question the detective about the specifics of the interview, the State again objected and again offered the video under the doctrine of optional completeness. The objection was again overruled.

Subsequently, after the State's redirect examination of the detective, a discussion about the admissibility of extraneous offenses occurred outside the presence of the jury. The discussion

5

Also during his testimony, Detective Carrasco confirmed that he had received information about an admission that appellant made to his wife that "seemed to corroborate that [appellant] had had intercourse with C.E." His subsequent testimony revealed that this corroborating information came from appellant's in-laws. Allegedly, appellant admitted having had sex with his niece to his wife, who then told her mother, who then told C.E.'s mother, Rosie, who then told Detective Carrasco.[6] In concluding his direct testimony, the detective detailed the considerations that led to his opinion that appellant had committed the sexual assault.

After the law enforcement officials testified, C.E.'s family members testified about her disclosure of the sexual assault. C.E. disclosed the sexual assault first to her 15-year-old cousin, B.E., at a family gathering. B.E. then told her father, Jesse, and had C.E. tell him what had happened. Jesse then notified his sister, C.E.'s mother, and was with them when C.E. told her mother about the assault. During his testimony at trial, Jesse described C.E.'s demeanor when she told him about the assault and when she recounted the details of the sexual assault to her mother. In her testimony, B.E. recounted the details of the sexual assault as C.E. had described it to her. She

_____

centered on the admission of appellant's alleged extraneous conduct with C.E.'s older sister when she was younger and did not clearly refer to the video or the issue of redaction. However, after the court made its ruling as to what extraneous-offense evidence would be admitted, defense counsel indicated that because the trial court had "ruled against [them]," the defense wanted the video of the interview admitted. He agreed to the admission of the video in its entirety "subject to [his] objections." When the State moved to publish the video to the jury, further discussions at the bench again established that defense counsel wanted the video shown subject to the previous objections, which the court clarified for the State as being "404(b) objections."

[6] The record reflects that Detective Carrasco called appellant's wife to ask about the alleged admission. In the phone call, which was recorded by the detective, appellant's wife said that she told her mom that her niece locked the door because that is what appellant told her. However, she repeatedly told the detective that her husband denied the allegations and told her over and over that "he didn't do it."

also described C.E.'s demeanor when she told about the assault, indicating that C.E. was upset. The State offered C.E.'s hearsay statements to her cousin as an "excited utterance," and the trial court admitted them as such.

C.E.'s mother, Rosie, also testified at trial. While she did not provide the details of the sexual assault that her daughter had shared with her, she testified that C.E. identified appellant as the one who sexually assaulted her. She described C.E. as "emotional" when she told her about the assault. Rosie's written statement to Officer Preston, detailing her daughter's account of the sexual assault to her, was admitted "for all purposes" during her testimony. Much of Rosie's testimony rebutted the assertions appellant made in his interview with the detective. For example, she denied that C.E.'s biological father might have sexually molested her daughter and denied knowing any reason why her daughter might have fabricated these allegations against appellant. Rosie also testified that she had learned earlier from her oldest daughter, J.A., that appellant was sexually interested in children.

Rosie's daughter, J.A., was 20 years old at the time of trial. She testified that appellant had a reputation among the children in the family for being a "pervert" and that she had warned the younger girls in the family, including C.E., to avoid him. She expressed her opinion that appellant was a sexual predator because of something he tried with her—several instances that had made her "feel uncomfortable." She alluded to three instances of conduct, recounting the details of the last incident, which occurred when she was nine or ten years old. She described an occasion in which she and appellant were in his bedroom, she was standing between his legs as he sat on the bed, and he grabbed her by her butt and pulled her toward him with a "creepy" smile on his face.

Melissa Rodriguez, the program director at the local child advocacy center, conducted the forensic interview of C.E. She testified about the process of forensically interviewing children and the expected behaviors of children when being interviewed. She also discussed factors that forensic interviewers consider when determining whether abuse allegations may be fabricated. She did not recount the details that C.E. shared with her about the sexual assault. She did, however, testify that nothing in the interview contradicted the report of sexual assault that she had received from law enforcement prior to the interview. She also indicated that she had prior experience with children who had fabricated allegations of sexual abuse and testified that she did not have any concerns that C.E. had fabricated these allegations, reported no such concerns to law enforcement, and saw "no red flags at all."

Finally, C.E. testified about the sexual assault appellant perpetrated against her that summer. She testified that although she was suspicious of her uncle, having been warned about him by her sister, J.A., she nonetheless had overnight visits at her aunt's house on several occasions to visit her younger cousin. She testified that during that summer, in late July or early August, she spent the night in her cousin's bedroom.[7] She said the next morning she stayed at the house while her cousin and aunt went to the store because she wanted to sleep some more. After they left, she locked the bedroom door and got back into bed. Immediately, she heard her uncle knocking on the door telling her to open the door. She refused and told him to go away. She then heard something at the door, got scared, and went to sit on the couch by the window to check for her aunt. C.E. testified that as she sat on the couch, she heard her uncle picking the lock. She said she did not know how, but her uncle gained entry into the room. He moved toward her and sat next to her on the

_____

[7] C.E. recalled that the incident had occurred after her birthday but before school started.

8

couch. When he sat down, she stood up. He then stood up as well, grabbed her, and starting kissing her on the mouth. She said she tried to avoid his kisses, moving her head and trying to back away, but he was too strong. She testified that they struggled, and eventually he pushed her onto the bed. She said appellant then got on top of her and starting kissing her again. He removed her pants, and, after some effort, put his penis into her vagina. She estimated the incident lasted for less than five minutes, after which appellant stopped, got up, and left, telling her to say nothing. C.E. then got dressed and returned to the couch to wait for her aunt to come home. She testified that she did not tell anyone in her family because she did not know what they would think. She was close to her cousin, B.E., however, and eventually told her about the incident because keeping it a secret "was killing [her] inside." During C.E.'s testimony, the State reoffered her written statement, which the court admitted without limitation. In providing the details of the sexual assault, C.E.'s testimony essentially repeated the accounts provided in Officer Preston's testimony, her cousin's testimony, her mother's written statement, and her own written statement.

The State rested after C.E.'s testimony. Appellant rested without calling witnesses. After the jury began deliberating, the trial court discharged a juror and replaced him with the alternate, after which the jury convicted appellant of the offense as charged. Appellant elected for the jury to assess punishment. He pled true to an enhancement allegation of a prior felony aggravated-assault conviction. The State did not call any witnesses during the punishment phase but offered into evidence a penitentiary packet reflecting the prior felony aggravated-assault conviction and a judgment reflecting a prior misdemeanor assault conviction. The jury assessed appellant's punishment at 80 years' imprisonment. This appeal followed.

9

## DISCUSSION

Appellant raises nine points of error on appeal. The first point of error complains about the removal of a juror during deliberations on guilt. The remainder of appellant's points of error raise evidentiary complaints about the trial court's admission of inadmissible hearsay statements, improper opinion testimony, and inadmissible character-conformity evidence.

## I.

### Removal of Juror

In his first point of error, appellant contends the trial court erred by excusing a juror, over his objection, after deliberations on guilt-innocence had begun and replacing him with the alternate juror.

Following voir dire on Monday, the jury and one alternate juror were sworn. Trial began the following morning. The guilt-innocence phase concluded three days later, and the jury was sent out to deliberate Thursday afternoon. At that time, the alternate juror was conditionally released with the court's admonition that he was still bound by the instructions of the court but was free to leave the courthouse, subject to recall if his services became necessary. Sometime after deliberations started—the record does not make clear when—the court apparently received information that one of the jurors, Mr. Brooks, had communicated with the court's bailiff about the case. The judge brought Juror Brooks into the courtroom to inquire about the nature of any communications he might have had. During the inquiry, Brooks confirmed that he had communicated with the bailiff, someone he knew from church, and had expressed to her his feelings about sitting as a juror in the case and rendering a verdict.

In response to the court's questions, Brooks indicated that "[he wasn't] sure" if he could follow the instructions of the court because he "would much rather be minding [his] own business at home." When the judge asked if he could sit in judgment of another person, he answered, "No. At this moment, no." When the court sought clarification, Brooks expressed uncertainty, stating, "I don't feel that I know enough to really make a sound judgment in this case." When his answers suggested that his uncertainty resulted from "going through a lot in [his own] life" at the time, the court questioned him about mental-health issues. Brooks denied any psychological problems, saying, "Well, I don't consider them psychological problems, I think some of them might be very sound, rational arguments." When the judge directly asked whether "situations going on in [his] life [were] creating some stress" for him, Brooks responded, "Not really." Ultimately, Juror Brooks explained,

> . . . The reason why I don't want to issue a verdict, particularly a not guilty [sic] verdict, is because I feel that based on the evidence that's been presented to us, the jury, I don't feel that there's enough to make me know that the guy did it. I mean, whether he did it or not, I could be about 50/50 about that, you know.
>
> . . . .
>
> So if it's an issue of everything based on what she says, I don't feel that that's enough to make me feel comfortable issuing a guilty verdict just because everybody else wants to.

The court confirmed with Brooks that this concern about rendering a guilty verdict was what he shared with the bailiff in his conversation with her.[8]

---

[8] The record reflects that throughout the questioning, Juror Brooks was uncomfortable at having to explain his feelings in open court. In his answers to the court, he expressed that he "sure wish[ed] [he] could talk to somebody in private about it," did not understand why he "would have to say it in front of [others]," and "wish[ed] [he] could tell [the judge] in private" because he "[knew]

After Juror Brooks left the courtroom, the State asked the judge to remove him from the jury and replace him with the alternate juror pursuant to article 33.011 of the Texas Code of Criminal Procedure. The prosecutor took the position that "Mr. Brooks has some, at the very least, probably significant external problems going on that may cause him to be under some emotional duress that render him unable to continue deliberating." She further argued that he violated the rules of the court by discussing "this case and his feelings and his comments on deliberation with a person not of his jury." Defense counsel responded that "it's not that [Brooks] can't follow the orders of the Court, it's that he doesn't agree with the rest of the jury, and he can't go along with them." He pointed out that the jury had not been deliberating long and that Brooks had indicated that he could not "agree at this time." He maintained that Juror Brooks was not disabled under the statute and that replacing him was not necessary or authorized.

Before making a ruling, the trial judge questioned his bailiff. She concurred "with what Mr. Brooks said with regard to his conversation with [her]" but indicated that he was more detailed about his feelings when answering the judge's questions. She confirmed that she knew Brooks from church as well as through other people in the community. The trial court asked her if she "ha[d] any understanding, one way or the other, of whether or not he would be of sound mind." In response, the bailiff opined that "he is painfully shy" and that she thought they would have a "hard time" getting him back in the jury room to continue deliberations because he was "strong-willed enough that he would not go in there."

---

people in this town." He indicated that part of the reason he shared his feelings about serving as a juror with the bailiff was because he was alone with her in the hallway.

12

At that point, the court found that Juror Brooks was "disqualified because, among other things, his communication to someone not of his jury about the details of the case." He further found that the communication was "not initiated or encouraged" by the bailiff. He granted the State's request to have the alternate juror replace Juror Brooks. Defense counsel renewed his objection by moving for a mistrial, which the court denied. The judge then determined, for record purposes, the length of the bailiff's conversation with Juror Brooks. The bailiff indicated it was "[l]ess than a minute," explaining, "As soon as he began discussing anything that related to evidence, I put my hand on his shoulder and I said, 'I need you to stop right there.'" Defense counsel further objected to the court's finding that Juror Brooks was disqualified.

### Standard of Review

The trial court has discretion to determine whether a juror has become disabled and to seat an alternate juror. *Scales v. State*, 380 S.W.3d 780, 783 (Tex. Crim. App. 2012); *see Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App. 2003). The trial judge is the sole fact-finder and judge of the credibility of the testifying juror, but the court's decision to replace a juror with an alternate is subject to review for an abuse of discretion. *Scales*, 380 S.W.3d at 784. In order to support its decision, the trial court must make a finding, sufficiently supported by the record, that the juror was disqualified or unable to perform the duties of a juror. *Id.*; *see* Tex. Code Crim. Proc. art. 33.011(b). It is not the role of an appellate court to substitute its own judgment for that of the trial court, but rather to assess whether, after viewing the evidence in the light most favorable to the trial court's ruling, the ruling was arbitrary or unreasonable. *Scales*, 380 S.W.3d at 784. The ruling must be upheld if it is within the "zone of reasonable disagreement." *Id.* Absent such an abuse of discretion, no reversible error will be found. *Id.*; *see Routier*, 112 S.W.3d at 588.

*Juror Communication*

The trial court based its finding that Juror Brooks was disqualified, and its subsequent decision to remove him, primarily on Brooks's communication with the bailiff.

A juror must make decisions at the guilt and punishment phases using information obtained in the courtroom: the law, the evidence, and the trial court's mandates. *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002); *see also McQuarrie v. State*, 380 S.W.3d 145, 152 (Tex. Crim. App. 2012). Accordingly, article 36.22 of the Texas Code of Criminal Procedure prohibits conversing with the jury: "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." Tex. Code Crim. Proc. art. 36.22; *see also* Tex. R. App. P. 21.3(f) (providing that defendant must be granted new trial when juror has talked with anyone about case). The main purpose of this statutory prohibition "is to prevent *an outsider* from saying anything that might influence a juror." *Ocon v. State*, 284 S.W.3d 880, 887 (Tex. Crim. App. 2009) (quoting *Chambliss v. State*, 647 S.W.2d 257, 266 (Tex. Crim. App. 1983) (emphasis in original)). The paramount issue is whether appellant received a fair and impartial trial; therefore, the analysis must focus on whether the juror was biased as a result of the improper conversation, not whether the juror biased an outsider. *Id.* If a violation is shown, the effectiveness of possible remedies will be determined in part by whether the conversation influenced the juror. *Id.* at 884.

A violation of article 36.22 triggers a rebuttable presumption of injury to the accused. *Id.*; *Klapesky v. State*, 256 S.W.3d 442, 452 (Tex. App.—Austin 2008, pet. ref'd). To invoke this presumption, a complaining party must show a communication between a juror and an unauthorized

person that involved matters concerning the case on trial.[9] *See Chambliss*, 647 S.W.2d at 265–66; *Klapesky*, 256 S.W.3d at 452. If it is shown that the case was not discussed or that nothing prejudicial to the accused was said, then appellant has not been injured. *Green v. State*, 840 S.W.2d 394, 406 (Tex. Crim. App. 1992), *disavowed on other grounds by Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999). Such a showing may rebut the presumption of harm. *Id.* Reviewing courts should consider the evidence rebutting the presumption of harm regardless of whether it was presented by the State or by the accused. *Bokemeyer v. State*, 355 S.W.3d 199, 203 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Alexander v. State*, 919 S.W.2d 756, 767 (Tex. App.—Texarkana 1996, no pet.).

We hold that the record in this case does not establish an article 36.22 violation. "[T]he language of Article 36.22 establishes two speakers, with attention directed toward the outsider's . . . speaking." *Ocon*, 284 S.W.3d at 885 n.4; *see Benefield v. State*, 389 S.W.3d 564, 570 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *see also Patterson v. State*, 293 S.W. 570, 571 (Tex. Crim. App. 1927) (op. on reh'g) (no violation of predecessor statute when juror made comment to third party and third party "made no reply to what the juror said"; court held that this was "not 'conversing with a juror,'" and thus there was no presumption of injury). Here, nothing in the record suggests that the bailiff communicated anything about the case to Juror Brooks outside the presence of, or without permission from, the court. The uncontroverted evidence established that the bailiff

---

[9] We note that generally there is no presumption of injury when the bailiff associates with the jury. *See Alexander v. State*, 919 S.W.2d 756, 766 (Tex. App.—Texarkana 1996, no pet.). In fact, Texas procedural law requires the county sheriff to provide a bailiff to the court to attend to the wants and needs of the jurors. *See* Tex. Code Crim. Proc. art. 36.24 (entitled "Officer Shall Attend Jury"). In this case, the trial judge instructed the jurors that the bailiffs of the court would be the "point of contact." Thus, the issue here is more correctly described as an unauthorized communication rather than a communication with an unauthorized person.

did not discuss the case with Juror Brooks, nor did she say anything even arguably prejudicial to appellant during her conversation with the juror. Thus, any presumption of injury was rebutted by this evidence. Further, there is no indication that Juror Brooks emerged from his conversation with the bailiff with any new information about the case that created a bias for or against either side. *See Ocon*, 284 S.W.3d at 887. Rather, Juror Brooks merely disclosed his feelings about serving as a juror due to his concerns about the evidence, i.e., he expressed his doubts. This disclosure, while perhaps improper, was not a conversation contemplated by article 36.22. Because the conversation did not constitute an unauthorized communication with a juror, it was not grounds for the disqualification of Juror Brooks. Further, we find the remedy the trial court utilized to address Juror Brooks's improper conduct—his removal from the jury—too extreme given the fact that the record does not reflect any bias or prejudice to either party as a result of the conversation.

### *Inability to Perform Duties*

The trial court determined that Juror Brooks was disqualified because of his unauthorized communication with the bailiff "among other things." The court did not explain what those "other" disqualifying things were. However, based on the State's request and argument urging the replacement of Juror Brooks with the alternate juror, we presume that one of those "other things" was the court's conclusion that Juror Brooks was unable or disqualified to perform his duties under article 33.011(b).

Article 33.011(b) of the Texas Code of Criminal Procedure states that, before a jury renders a verdict regarding a defendant's guilt or innocence, or assesses a punishment when applicable, alternate jurors "shall replace jurors who . . . become or are found to be unable or disqualified to perform their duties[.]" Tex. Code Crim. Proc. art. 33.011(b). Thus, when a regular

16

juror becomes unable or disqualified to perform his duties, Texas law requires that the juror be replaced with the alternate juror. *Id.*; *Scales*, 380 S.W.3d at 783; *Romero v. State*, 396 S.W.3d 136, 148 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). The statute does not define "unable to perform," but appellate courts have concluded that "unable" as used in article 33.011 is indistinguishable from "disabled" as used in article 36.29. *See Scales*, 380 S.W.3d at 783; *Sneed v. State*, 209 S.W.3d 782, 786–87 (Tex. App.—Texarkana 2006, pet. ref'd). The court of criminal appeals has interpreted "disability" under article 36.29 to require that a disabled juror suffer from "a physical illness, mental condition, or emotional state that would hinder or inhibit the juror from performing his or her duties as a juror," or that the juror was suffering from a condition that inhibited him from "fully and fairly performing the functions of a juror." *Scales*, 380 S.W.3d at 783 (internal quotation marks omitted); *see Routier*, 112 S.W.3d at 588. To support its decision that a juror is disabled, the trial court must make a finding, sufficiently supported by the record, that the juror was disqualified or unable to perform the duties of a juror. *Scales*, 380 S.W.3d at 783. The trial court may not dismiss a juror for reasons related to that juror's evaluation of the sufficiency of the evidence. *Id.* at 783–84 (citing *United States v. Edwards*, 303 F.3d 606, 633 (5th Cir. 2002)).

The record in this case does not support a finding that Brooks was unable to perform his duties as a juror, only that he was disinclined to do so. Nothing in the record indicates that his feelings hindered him from "fully and fairly performing [his] functions as a juror," he simply had an aversion to doing so because he had doubts about the sufficiency of the evidence. Although his testimony demonstrates that he was troubled by his doubts and frustrated at potentially being the hold-out juror, at no time did Brooks indicate that he would not, or could not, deliberate further. Nothing demonstrates that he was emotionally distraught or unable to deliberate, as the State

17

suggests. He only expressed that he was disinclined to return a guilty verdict because he found the evidence lacking. Overall, his testimony simply expressed his doubt concerning appellant's guilt. His aversion to performing his duties as a juror stemmed from his discomfort of having a "reasonable doubt" when others on the jury, apparently, did not. However, the trial court was not permitted to dismiss Juror Brooks for reasons related to his evaluation of the sufficiency of the evidence. *See id.*

Under these circumstances, we conclude the trial court abused its discretion in finding Juror Brooks disqualified, removing him from service, and replacing him with the alternate juror.

*Harm Analysis*

We must now address whether the erroneous removal of Juror Brooks from the jury was harmful to appellant. For purposes of this opinion, we will assume, without deciding, that the trial court's erroneous removal of Juror Brooks constituted statutory error and must therefore be analyzed under Texas Rule of Appellate Procedure 44.2(b).[10] *See id.* at 786; Tex. R. App. P. 44.2 (b). Under Rule 44.2(b), "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's

---

[10] Appellant did not complain at trial, as he does on appeal, that the removal of Juror Brooks violated his right to due process. The discussions and argument concerning Brooks's disqualification or disability only referenced article 33.011. Thus, his complaint that the removal violated his constitutional right to due process was not preserved for appellate review. *See* Tex. R. App. P. 33.1(a) (to preserve complaint for appellate review, party must have presented specific and timely request, motion, or objection to trial court and, further, must have obtained adverse ruling); *see also Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Peavey v. State*, 248 S.W.3d 455, 470 (Tex. App.—Austin 2008, pet. ref'd).

verdict. *Scales*, 380 S.W.3d at 786 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

The testimony of Juror Brooks indicated that the other members of the jury were seemingly in favor of conviction, whereas he was not due to his concerns about the sufficiency of the evidence proving guilt. If the jury had been allowed to continue deliberating, his uncertainty or reasonable doubt may have been resolved by further deliberations. This would have produced a verdict. Or, he may have maintained his views of the evidence and his reasonable doubt, resulting in a deadlocked jury. This would have resulted in a mistrial. *See* Tex. Code Crim. Proc. art. 36.31 (procedure for when jury cannot agree). Because of the error, neither possibility was allowed to occur. *See Scales*, 380 S.W.3d at 786–87. Given the record before us, which demonstrates that Juror Brooks considered the evidence insufficient to prove appellant's guilt beyond a reasonable doubt and therefore felt uncomfortable rendering a guilty verdict, it appears a mistrial was the more probable of the possible outcomes. After he was replaced, the jury returned a guilty verdict, sufficiently demonstrating that the erroneous removal had "a substantial and injurious influence in determining the jury's verdict." *See id.* Thus, the error of removing Juror Brooks affected a substantial right of appellant's. We sustain appellant's first point of error.

## II.

### Hearsay Evidence

In four points of error, appellant complains about the admission of hearsay evidence. In his second point of error, he asserts that the trial court erred in allowing Officer Preston to testify

about the substance of C.E.'s written statement detailing the sexual assault.[11]  In his third point of error, appellant maintains that the trial court erred in admitting the written statements that C.E. and her mother provided to Officer Preston when reporting the assault.  In his sixth point of error, appellant argues that the trial court erred in overruling his hearsay objection to an out-of-court statement concerning appellant's alleged admission of guilt to his wife.  In his seventh point of error, appellant contends the trial court erred when it admitted, as an excited utterance, C.E.'s hearsay statements to her cousin describing the sexual assault.

The State argues that Officer Preston's testimony detailing C.E.'s account of the incident, the written statements of C.E. and her mother, and Detective Carrasco's testimony concerning appellant's alleged admission of guilt to his wife were not objectionable hearsay because the State did not offer them for the truth of the matters asserted but rather "to explain why the witness undertook the investigative action that he undertook."  The State further maintains that C.E.'s statements disclosing the assault to B.E. constitute an excited utterance.

### Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion.  *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).  A trial court abuses its discretion only if its decision "lies outside the zone of reasonable disagreement." *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).  We consider the ruling in light of what was before the trial

---

[11]  It is clear from the officer's testimony that he received details of the assault from C.E. in both oral and written form, first from his interview of her and then afterwards when she produced a written statement.  We construe this point of error as complaining about the officer's repetition of the details of the sexual assault provided by C.E., whether orally or in written form.

court at the time the ruling was made and uphold the trial court's decision if it lies within the zone of reasonable disagreement. *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009).

### *Hearsay*

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is inadmissible except as provided by statute or the rules of evidence. Tex. R. Evid. 802. A statement not offered to prove the truth of the matter asserted is not hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995).

#### *Information Acted On*

The State may offer out-of-court statements in evidence without violating the hearsay rule to explain why the defendant became the subject of the investigation. *See Dinkins*, 894 S.W.2d at 347. "An arresting officer should not be put in the false position of seeming just to have happened upon the scene, he should be allowed some explanation of his presence and conduct." *Schaffer v. State*, 777 S.W.2d 111, 114–15 (Tex. Crim. App. 1989). Therefore, "testimony by an officer that he went to a certain place or performed a certain act in response to generalized 'information received' is normally not considered hearsay because the witness should be allowed to give some explanation of his behavior." *Poindexter v. State*, 153 S.W.3d 402, 408 (Tex. Crim. App. 2005). "But details of the information received are considered hearsay." *Id.* The officer "should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that [he] was entitled to tell the jury the information upon which [he] acted." *Schaffer*, 777 S.W.2d at 114–15. "The appropriate inquiry focuses on whether

21

the 'information received' testimony is a general description of possible criminality or a specific description of the defendant's purported involvement or link to that activity." *Head v. State*, 4 S.W.3d 258, 261 (Tex. Crim. App. 1999).

Initially, we note that Officer Preston was a patrol officer, not an investigator. In fact, in offering his testimony, the State emphasized that his duties in this case did *not* include investigatory responsibilities. During direct examination, the prosecutor initiated the following exchange:

Q. Now, when you're on patrol -- I mean, your duties are very different than a detective, aren't they?

A. Yes, ma'am.

Q. What's the difference, I guess? Or what do you understand that your role is when you're on patrol versus, say, if you were, like, a detective in the case?

A. My role as patrol is to be in the city as a deterrent to crime and to just patrol around and be of service.

Q. Okay. When you take a report, are you the -- I guess, do you get the initial facts?

A. Yes, ma'am.

Q. Okay. Do you continue on to do any kind of in-depth investigation like a detective would do?

A. Not in all cases, no.

Q. Okay. In these types of cases, do you generally -- does the patrol officer, is he the one who continues on the investigation if you have a report of sexual assault?

A. No, ma'am.

Q. Okay. Now, in this case, can you tell the jury exactly what you did once you got to the police department?

A.      I arrived at the police department, I met with Rosie, spoke with her as to how I can help her. She stated her daughter had been sexually assaulted.

At this point, defense counsel objected on hearsay grounds. The trial court sustained the objection. The prosecutor then averred, "I'm not offering it for the truth of the matter asserted, Your Honor, I'm just offering it to show what information he acted upon." The trial court then impliedly overruled the hearsay objection by giving a limiting instruction to the jury before allowing the prosecutor to continue questioning.[12] The prosecutor then continued questioning the officer about his limited role in the case:

Q.      And just to clarify, Officer Preston, when you're taking a report from people, you're just taking down what they're telling you, you're not going out and verifying the truth of it or not; is that right?

A.      Yes, ma'am.

Q.      Okay. So we're going to talk about what you were told as far as just the information that you were taking down. But you, yourself, didn't independently verify the truth of it or nontruth of it.

A.      No, ma'am.

Later, when appellant objected to the State's offer of the written statements of C.E. and her mother on hearsay grounds, the prosecutor responded:

---

[12] The trial court instructed the jury:

As to that statement as to what the third person said, the jury may choose to consider it or not consider it. If the jury chooses to consider it, they only may consider it for information that the officer acted on and not for the truth of what was asserted in that statement.

23

> Judge, I'm not going to waste the Court's time by restating everything that I've said with regard to that it's not offered for the truth of the matter asserted. This officer is entitled to talk about what he acted on, what he did, what he obtained, and that's not hearsay. It's not a hearsay exception, it's not hearsay in any form.
>
> The jury has been admonished now, I think by my count, at least three times that this is not being offered because -- to show that it's true, it's being offered to show what this police officer acted upon, the information that he took and what he did afterwards.

Subsequently, on redirect examination, the prosecutor again questioned Officer Preston about his limited duties:

> Q. [Defense counsel] asked you if you did a whole bunch of different things. But we talked about as a patrol officer, those things that he just asked you about, that's not your job to do those things, is it?
>
> A. Not in reference to this case or these types of cases, no.
>
> Q. Okay. So when he's asking you all these things that you didn't do this, you didn't do that, those were all things that you weren't supposed to be doing, right?
>
> A. Yes, ma'am.

It is difficult to discern how C.E.'s hearsay statements to the officer about the sexual assault or either of the written statements provided to the officer were "information acted upon," as the State contends, when the record explicitly reflects that the officer did not have the duty or responsibility to act on such information, nor did he do so.

Nevertheless, even assuming Officer Preston had "acted upon" the information received during his interview of C.E. or contained in the written statements he obtained, his testimony at trial provided a complete account of C.E.'s description of the sexual assault, revealing the specific details he received from C.E. The officer's testimony is replete with "[C.E.] said . . ."

24

preceding particular facts given by C.E. His testimony was not merely a generalized description of possible criminality that explained how appellant came to be a suspect but contained specific details about the sexual assault, all of which he obtained from his interviews of C.E. and her mother and their written statements. Thus, he "provided far greater detail than was reasonably necessary to explain why" he decided to forward the case to the Criminal Investigation Division for investigation (the only action he took after receiving the information). *See Langham v. State*, 305 S.W.3d 568, 580 (Tex. Crim. App. 2010) (detective's representation of confidential informant's statements provided far greater detail than was reasonably necessary to explain why police decided to investigate appellant's residence). In the same way, C.E.'s written statement and her mother's written statement provided specific details of the incident. They too provided more than a general description of possible criminal activity but instead gave a detailed description of appellant's involvement in such criminal activity (his perpetration of the sexual assault). Officer Preston's testimony and the written statements were inadmissible hearsay.

All of this hearsay evidence—Officer Preston's testimony about C.E.'s statements, C.E.'s written statement, and Rosie's written statement—was not offered to explain how appellant became the focus of a police investigation. The hearsay evidence went far beyond the permissible general description of information received about possible criminality and instead provided specific details and descriptions of appellant's involvement in the sexual assault. Consequently, this evidence was inadmissible, and the trial court erred in overruling appellant's hearsay objections and admitting the evidence.

*Excited Utterance*

Excited utterances are an exception to the hearsay rule. An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex. R. Evid. 803(2); *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). The exception is based on the assumption that the declarant is not, at the time of the statement, capable of the kind of reflection that would enable him to fabricate information. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005); *see Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) ("The basis for the excited utterance exception is a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'"). The statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event. *Zuliani*, 97 S.W.3d at 595; *Lagunas v. State*, 187 S.W.3d 503, 512 (Tex. App.—Austin 2005, pet. ref'd). For the excited-utterance exception to apply, (1) the exciting event must be startling enough to evoke a truly spontaneous reaction from the declarant, (2) the reaction to the startling event must be quick enough to avoid the possibility of fabrication, and (3) the resulting statement should be sufficiently "related to" the startling event to ensure the reliability and trustworthiness of that statement. *McCarty v. State*, 257 S.W.3d 238, 241–42 (Tex. Crim. App. 2008) (discussing similarity between Rule 803(2) "excited utterance" exception and common law "spontaneous utterance" exception).

The primary factor rendering an excited utterance reliable is the spontaneous nature of the statement. *Tezeno v. State*, 484 S.W.2d 374, 379 (Tex. Crim. App. 1972); *Mumphrey v. State*,

155 S.W.3d 651, 658 (Tex. App.—Texarkana 2005, pet. ref'd). The statement must have been made before the declarant's excitement caused by the startling event or condition has abated. *Zuliani*, 97 S.W.3d at 596; *see, e.g.*, *Wood v. State*, 18 S.W.3d 642, 652 (Tex. Crim. App. 2000) (hearsay statement properly excluded because it was separated from event it concerned by ten to twelve hours and declarant's behavior in interim did not indicate any excitement or nervousness on declarant's part). The key to this hearsay exception is that the statement be made without reflection and an opportunity to fabricate. *Apolinar*, 155 S.W.3d at 186 (examining record for evidence that declarant did not have meaningful opportunity to reflect); *see Martinez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005) (must be shown that declarant had no time or opportunity to calm herself and reflect on two-day old events); *Harris v. State*, 133 S.W.3d 760, 772 (Tex. App.—Texarkana 2004, pet. ref'd) (whether declarant had opportunity to reflect and fabricate was dispositive determination).

The startling event need not be the original offense but can be a subsequent event, so long as it is itself startling or shocking. *Harvey v. State*, 123 S.W.3d 623, 630 (Tex. App.—Texarkana 2003, pet. ref'd); *see McCarty*, 257 S.W.3d at 240 ("[U]nder the excited-utterance exception, the startling event may trigger a spontaneous statement that relates to a much earlier incident."). Further, the requisite excitement that provokes or induces the spontaneous statement may be a condition, such as physical pain, fear, or mental anguish. *Salazar*, 38 S.W.3d at 154. However, a shocking or startling event or condition must trigger the utterance. *See Harvey*, 123 S.W.3d at 630; *see also Sellers v. State*, 588 S.W.2d 915, 918–19 (Tex. Crim. App. 1979).

We review a trial court's determination of whether evidence is admissible under the excited-utterance exception to the hearsay rule for an abuse of discretion. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *Lagunas*, 187 S.W.3d at 512. Factors we may

consider in evaluating whether a statement qualifies as an excited utterance include the length of time between the occurrence and the statement, the characteristics of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving. *Apolinar*, 155 S.W.3d at 187; *Lagunas*, 187 S.W.3d at 512. The ultimate inquiry is whether the emotions, excitement, fear, or pain of the event or condition still dominated the declarant at the time of the statement. *Apolinar*, 155 S.W.3d at 186–87; *Lagunas*, 187 S.W.3d at 512; *see Coble*, 330 S.W.3d at 294.

According to B.E.'s testimony, she and C.E. were in her room when her sister came into the room and mentioned appellant's name in conversation. C.E. then commented that "she didn't like him (appellant)" and asked B.E., "Can I tell you something?" B.E. testified that C.E. expressed that "she was scared to tell anybody," but she was able to convince C.E. to tell her what happened. When the prosecutor asked B.E. whether C.E. "seem[ed] to be under the emotions of what had happened to her" when she described the assault, B.E. answered affirmatively, indicating that she knew C.E. was upset because she "could hear it in her voice that she was shaky" and she saw tears coming down C.E.'s face.

While there is no question that C.E. was emotional when she told her cousin about the assault, the test is whether, at the time of the utterance, C.E. was under domination of the emotions triggered by a startling event, either the original sexual assault or, alternatively, the mention of appellant's name.[13] We conclude that C.E.'s disclosure of the assault to her cousin does not

---

[13] In its brief, the State maintains that the startling event was not the sexual assault but "fear of hatred and ostracizing by the victim's own family." However, while the requisite excitement that provokes the spontaneous statement may be a condition, such as fear, *see Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001), the fear the State describes here was not a *triggering* condition. The record does not reflect that her fear of her family's reaction (to the sexual assault or

28

qualify as an excited utterance. While the original assault was undoubtedly shocking, the record does not support that C.E. was still, three or four months later, dominated by the excited state produced by the attack. Nor does the record reflect that the mention of appellant's name was the type of startling or shocking event contemplated by the excited-utterance rule.[14] *See, e.g.*, *Barnes v. State*, 165 S.W.3d 75, 81 (Tex. App.—Austin 2005, no pet.) (11-year-old victim's report of sexual abuse to police officer not excited utterance because, although testimony established that victim was crying and "very upset" during description of sexual abuse, there was no evidence that her emotional state was due to stress of excitement caused by some startling event or condition because sexual abuse happened five years earlier and there was no evidence of additional startling event that triggered statements to officer); *Harvey*, 123 S.W.3d at 631 (outcry six years after sexual assault not shown to be excited utterance even though declarant was "very upset about it, crying" when, as an adult, she "broke down" and told her boyfriend details of assault when answering his questions about paternity of her son).

C.E.'s statements were not made "suddenly" or "immediately" after the startling event, which we assume, for purposes of analysis, was the sexual assault. She did not blurt out the statements, but instead made them after seeking permission from her cousin to share information with her. She also prefaced them by indicating that she was scared to tell because, according to B.E., "she felt like if she would have told somebody, then the whole family would hate her even though it's not her fault." Also, C.E. was fifteen years old when she told her cousin about the sexual assault.

---

her disclosure of it) caused C.E. to spontaneously make her statements to her cousin. In fact, the opposite is true. Her fear prevented her from telling about the assault.

[14] We do not hold that the mere mention of a perpetrator's name cannot constitute a startling or shocking event, only that it does not under the facts of this case.

These circumstances surrounding C.E.'s statements—her age, the delay, her reluctance, and her contemplation of consequences—all weigh against the spontaneity requirement for the excited-utterance exception. *See Apolinar*, 155 S.W.3d at 186 (excited utterance based on assumption that at time of statement, declarant is not capable of kind of reflection that would enable her to fabricate information). When the exception is expanded beyond utterances made immediately or soon after exposure to the startling event or condition, "prevarication becomes a significant possibility." *See* David F. Binder, *Trial Practice Series: Hearsay Handbook* § 9.7 (4th ed. 2012). "Stress and prevarication are not mutually exclusive." *Id.* Emotions, even strong ones, do not necessarily demonstrate the lack of time or opportunity to contrive or misrepresent information.

C.E.'s disclosure to her cousin was a narrative of a painful event, not an excited utterance. *See Glover v. State*, 102 S.W.3d 754, 764 (Tex. App.—Texarkana 2002, pet. ref'd). Her delay in disclosing the assault, her reluctance to tell as indicated by seeking permission to share "something" with her cousin, her expression of concern about the family's reaction, and her age support our conclusion that, at the time of the statements, C.E. had had the time, opportunity, and capacity to reflect before telling her cousin about the sexual assault. Thus, C.E.'s statements did not qualify as an excited utterance and therefore do not fall within this exception to the hearsay rule. Accordingly, we conclude that the trial court erred in admitting C.E.'s hearsay statements through her cousin's testimony.

*Appellant's Alleged Admission*

In his sixth point of error, appellant asserts that the trial court erred in admitting Detective Carrasco's testimony concerning appellant's alleged admission of guilt to his wife.

30

Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Wilson v. State*, 311 S.W.3d 452, 473–74 (Tex. Crim. App. 2010) (citing *Ford*, 305 S.W.3d at 532). To preserve an issue for appellate review, a party must timely object, stating the specific legal basis for the objection. Tex. R. App. P. 33.1(a)(1). Further, with two exceptions that do not apply here, a party must continue to object each time the objectionable evidence is offered.[15] *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).

The State introduced evidence about appellant's purported admission of guilt to his wife during direct examination of the detective:

Q. Well, let me ask you this: Did you receive any information on the 29th that seemed to corroborate the fact that this defendant had had intercourse with [C.E.]?

A. Yes, ma'am, I did.

Q. And was that, by your understanding, an admission that the defendant had made to his wife?

A. Yes, ma'am.

At that point, appellant objected on hearsay grounds. The trial court overruled the objection "under the circumstances."

---

[15] The two exceptions require counsel to either (1) make a running objection, or (2) request a hearing outside the presence of the jury. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)).

Later, on redirect, the prosecutor asked Detective Carrasco,

Q.   And we had talked earlier about the fact that this defendant had actually corroborated -- without getting into the statement that she made -- but that this defendant corroborated to his wife that this actually did occur, correct?

A.   Correct.

Appellant did not object. Thus, although appellant initially objected, he did not continue to object to the evidence of his alleged admission to his wife. Therefore, he did not preserve this complaint for appeal. *See Martinez*, 98 S.W.3d at 193. Accordingly, we overrule appellant's sixth point of error.

### *Harm Analysis*

The erroneous admission of evidence is non-constitutional error. *Kirby v. State*, 208 S.W.3d 568, 574 (Tex. App.—Austin 2006, no pet.); *see Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* Tex. R. App. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance the error did not influence the jury, or influenced the jury only slightly. *Barshaw*, 342 S.W.3d at 93; *Kirby*, 208 S.W.3d at 574.

In assessing potential harm, our focus is not on whether the outcome of the trial was proper despite the error but on whether the error had a substantial or injurious effect or influence on the jury's verdict. *Barshaw*, 342 S.W.3d at 93–94. We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Id.* at 93; *see Coble*, 330 S.W.3d at 280 (in conducting harm analysis "we examine the entire trial record and calculate,

as much as possible, the probable impact of the error upon the rest of the evidence"). We consider all the evidence that was admitted at trial, the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94. We may also consider the jury instructions, the parties' theories of the case, closing arguments, voir dire, and whether the State emphasized the error. *Id.*; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

We must reverse a conviction for non-constitutional error if we have "grave doubt" about whether the result of the trial was free from the substantial influence of the error. *Barshaw*, 342 S.W.3d at 94. "'Grave doubt' means that 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" *Id.* (quoting *Burnett v. State*, 88 S.W.3d 633, 637–38 (Tex. Crim. App. 2002)). "[I]n cases of grave doubt as to harmlessness the [appellant] must win." *Id.*

The erroneously admitted hearsay evidence in this case was not innocuous. C.E.'s hearsay statements detailing the sexual assault were erroneously admitted in four separate instances, over objection, *before* C.E. testified, in both oral and written form. The State emphasized the hearsay statements throughout trial, asking several witnesses if C.E.'s statements were consistent with each other.[16] In addition, the State referred to C.E.'s hearsay statements, and the consistency

---

[16] Questions about consistency among statements are not necessarily improper, as they may or may not convey the contents of the out-of-court statement in violation of the hearsay rule. *See Head v. State*, 4 S.W.3d 258, 264 (Tex. Crim. App. 1999) (Womack, J., concurring) (in context of case, "the evidence was offered to prove that there were no inconsistencies at that time in the investigation which would have called for [the investigator] to take other investigatory steps. The evidence was that the three persons had given consistent statements, but there was no evidence of the contents of those statements."). Here, however, the statements themselves were admitted into evidence. Thus, the questions about consistency improperly conveyed the content of the statements.

33

among them, in closing arguments: "Consistency over time is a big deal. She was consistent with her oral statement to [Officer Preston] and her written statement." The State also referred to Rosie's written statement in closing argument and encouraged the jury to look at it during deliberations.

The State suggests that any error in admitting C.E.'s hearsay statements was not harmful because they were admitted with a limiting instruction.[17] We disagree. An instruction that instructs a jury to consider inadmissible evidence for a limited purpose still instructs a jury to consider inadmissible evidence. *Jackson v. State*, 320 S.W.3d 873, 888 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Bjorgaard v. State*, 220 S.W.3d 555, 562 (Tex. App.—Amarillo 2007), *pet. dism'd, improvidently granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008)). The complained-of hearsay evidence should not have been considered for *any* purpose. The limiting instruction does not mitigate harm or render the error harmless. We also note that while initially admitted for limited consideration, the written statements were subsequently admitted "for all purposes."

The State further asserts that any error in admitting C.E.'s hearsay statements (through the officer's testimony, her cousin's testimony, or her written statement) or Rosie's written statement was harmless because the witnesses ultimately testified at trial. Again, we disagree. First, we reject the proposition that the subsequent testimony of a declarant automatically renders the earlier improper admission of a hearsay statement harmless. If that were the case, the prohibition on hearsay evidence would cease to exist in any meaningful way, as its operation would be dependent on whether a declarant testifies.

---

[17] The State makes this argument only with respect to Officer Preston's testimony, the written statements, and appellant's statement to his wife. C.E.'s hearsay statements to B.E. were admitted without a limiting instruction.

34

Second, while it is true that error in the admission of evidence *may* be rendered harmless when substantially the same evidence is admitted elsewhere without objection, *see Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove."), we do not believe this case presents such a situation. The doctrine of harmless error the State relies on is based on the concept of waiver. *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998) (explaining that Texas applies "futility rule," meaning that despite trial court's ruling that evidence is admissible, party must keep making futile objections on pain of waiver); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) ("[I]t is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered."). The premise is that because the defendant failed to object to the inadmissible evidence at some point, he waived the right to complain about its admission elsewhere. Here, however, appellant objected to the admission of C.E.'s hearsay statements throughout trial. The only time evidence of similar facts was admitted without objection was through C.E.'s own testimony. However, her direct testimony about the sexual assault was not objectionable evidence, only her hearsay statements about it were. Thus, allowing her direct testimony to come in "without objection" did not constitute a waiver of the objection to her hearsay statements.

We further reject the State's argument about the mitigating effect of witnesses testifying at trial, because Rosie's subsequent testimony at trial did not render the erroneous

35

admission of her written statement harmless.[18] Other than appellant's identity as the perpetrator, she did not testify to the contents of her statement, so the same information did not come in through her testimony.

This case was, as these cases typically are, a "he said, she said" case. *See Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009) ("Sexual assault cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence."). The only direct evidence of the sexual assault was C.E.'s account in her testimony.[19] The State presented no corroborating evidence.[20]

---

[18] We note that Rosie's written statement contained multiple levels of hearsay. *See* Tex. R. Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."). First, she was the declarant of the written statement. The content of her statement was not admissible under any hearsay exception. Further, the statement contained hearsay statements of her daughter recounting the details of the sexual assault. These statements were not admissible under any hearsay exception.

[19] We do not suggest that C.E.'s testimony alone would be insufficient to support a conviction for sexual assault. *See* Tex. Code Crim. Proc. art. 38.07(a),(b)(1); *Perez v. State*, 113 S.W.3d 819, 838 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571, 587 (Tex. Crim. App. 2008). Nor do we suggest that the State has any burden to produce any corroborating or physical evidence. *See Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Benton v. State*, 237 S.W.3d 400, 404 (Tex. App.—Waco 2007, pet. ref'd)). We merely note the nature of the evidence supporting the verdict and how the inadmissible hearsay evidence might be considered in connection with other evidence in the case in our evaluation of the harmful effect of the erroneously admitted evidence.

[20] We note that appellant's purported admission to his wife could, arguably, be construed as evidence corroborating C.E.'s account. However, the State offered such evidence for the limited purpose of showing "the information [the detective] acted upon." Several times during questioning about the admission or conversations related to it, the trial court instructed the jury about the limited purpose. Thus, evidence of appellant's alleged admission was not substantive evidence of an admission of guilt. Furthermore, a recording of Detective Carrasco's phone call to appellant's wife asking her about the alleged admission was admitted into evidence. During that call, appellant's

36

C.E.'s testimony was improperly bolstered by the repetition of her hearsay statements through Officer Preston's testimony, her cousin's testimony, her mother's written statement, and her own written statement.[21] Moreover, during deliberations the jury asked the court for copies of the written statements of C.E. and her mother, as well as a copy of the police report. This request alone supports the conclusion that the erroneously admitted hearsay statements influenced the jury's decision.

Viewing the record as a whole, we do not have fair assurance that the erroneous admission of the complained-of hearsay statements did not influence the jury. In other words, we have "grave doubt" about whether the result of the trial was free from the substantial influence of this error. Accordingly, we sustain appellant's second, third, and seventh points of error.

---

wife repeatedly told the detective that her husband denied the allegations, said it did not happen, and told her over and over that "he didn't do it." No evidence of an actual admission—what appellant said to his wife under what circumstances—was admitted, only inferences of such through multiple hearsay statements. Consequently, we do not consider appellant's alleged admission to his wife, as reflected in this record, to be corroborating evidence of guilt.

[21] Repetition is an effective method of persuasion. Experimental psychologists have found that after hearing a plausible statement repeated, the listener becomes more confident that the statement is true, whether or not it actually is. *See, e.g.*, Wesley G. Moons, Diane M. Mackie & Teresa Garcia-Marques, *The Impact of Repetition-Induced Familiarity on Agreement With Weak and Strong Arguments*, 96 J. PERSONALITY & SOC. PSYCHOL., 32, 42–44 (2009); Kimberlee Weaver, Stephen M. Garcia, Norbert Schwarz & Dale T. Miller, *Inferring the Popularity of an Opinion From Its Familiarity: A Repetitive Voice Can Sound Like a Chorus*, 92 J. PERSONALITY & SOC. PSYCHOL. 821, 832 (2007); Ian Maynard Begg, Ann Anas & Suzanne Farinacci, *Dissociation of Processes in Belief: Source Recollection, Statement Familiarity, and the Illusion of Truth*, 121 J. EXPERIMENTAL PSYCHOL.: GEN. 446, 446 (1992); Lynn Hasher, David Goldstein & Thomas Toppino, *Frequency and the Conference of Referential Validity*, 16 J. VERBAL LEARNING & VERBAL BEHAV. 107 (1977).

## Opinion Testimony

In two points of error, appellant contends that the trial court erred by allowing improper opinion testimony from Detective Carrasco.

### *Opinion on Truthfulness of Allegations*

In his fourth point of error, appellant maintains that the trial court erred in overruling his objection to certain questions propounded to Detective Carrasco that elicited his opinion concerning the truthfulness of C.E.'s allegations.

"[E]xpert testimony that a particular witness is truthful is inadmissible under Rule 702." *Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993). Thus, the State may not elicit expert testimony that a particular child is telling the truth, or that child complainants as a class are worthy of belief. *Pavlacka v. State*, 892 S.W.2d 897, 903 n.6 (Tex. Crim. App. 1994); *Yount*, 872 S.W.2d at 711; *cf. Barshaw v. State,* 320 S.W.3d 625, 629–30 (Tex. App.—Austin 2010), *rev'd on other grounds*, 342 S.W.3d 91 (Tex. Crim. App. 2011). Nor may an expert offer an opinion on the truthfulness of a child complainant's allegations. *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997). Such testimony "crosses the line" between evidence that will genuinely assist the jury and that which usurps the jury's function to judge the credibility of witnesses. *Pavlacka*, 892 S.W.2d at 903 n.6; *Yount*, 872 S.W.2d at 708. Instead of experts, it is jurors who must draw "conclusions concerning the credibility of the parties in issue." *Yount*, 872 S.W.2d at 710; *see Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) ("[T]he jury is the *sole* judge of the witnesses' credibility and the weight to be given their testimony.").

At the conclusion of Detective Carrasco's direct examination, the State elicited the detective's opinion about C.E.'s interview at the child advocacy center:

Q.  Was there anything about her demeanor when you're looking at her body language or anything about that interview that led -- that gave you any sort of -- that raised any red flags again? I use that term a lot, but any red flags to you that she was somehow fabricating the story?

Appellant's counsel objected, asserting "Counsel is interfering with the providence [sic] of the jury, that's for the jury to make up their mind."[22] The trial court overruled the objection. At the detective's request, the prosecutor repeated the question:

Q.  Sure. Was there anything that you observed about [C.E.]'s demeanor or anything that you saw in that interview that led you to have any kind of doubts or red flags about whether or not she was fabricating the story she was giving the interviewer?

A.  No, ma'am.

We agree with appellant that the detective's answer essentially expressed his opinion that C.E. was not fabricating her allegations—an inadmissible opinion as to C.E.'s truthfulness. *See Lewis v. State*, No. 02-11-00112-CR, 2012 WL 858601, at *1 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op., not designated for publication) (court construed testimony of CPS investigator that she did not "see any signs that [child] was being deceptive in any way" when she watched forensic interview conducted at children's advocacy center as "falling within scope of the type of expert testimony deemed inadmissible in *Schutz* and *Yount*—an opinion as to the truthfulness of a

---

[22] Assuming counsel was attempting to object to this question because the answer would "invade the province of the jury," we note that an expert's testimony is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *See* Tex. R. Evid. 704. Consequently, it "is no longer a valid objection" to assert that an expert's testimony "invades the province of the jury." *Oritz v. State*, 834 S.W.2d 343, 348 (Tex. Crim. App. 1992). However, counsel's objection was valid under *Yount* and *Schutz* because the question elicited an opinion on the truthfulness of C.E.'s allegations.

39

witness"); *see also Kelly v. State*, 321 S.W.3d 583, 602 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (concluding State's expert should not have been allowed to imply that child victims were telling truth by claiming she would not have agreed to be witness if she saw evidence of deception).

The State asserts that the detective's testimony was admissible as a lay opinion to rebut assertions that C.E. was lying. We disagree. If a witness's general character for truthfulness has been attacked, Rule of Evidence 608(a) allows, for purposes of rehabilitation, the presentation of opinion or reputation evidence of that witness's good character for truthfulness. *Michael v. State*, 235 S.W.3d 723, 725–26 (Tex. Crim. App. 2007); *see* Tex. R. Evid. 608(a)(2). However, a lay witness may not, under Rule 608, testify to the complainant's truthfulness in the particular allegations. *Fuller v. State*, 224 S.W.3d 823, 832–33 (Tex. App.—Texarkana 2007, no pet.); *see Schutz*, 957 S.W.2d at 72 (attacking witness's character for truthfulness does not open door to evidence supporting truthfulness of specific allegations). Detective Carrasco's testimony was not opinion or reputation evidence concerning C.E.'s truthful character. Rather, it was his opinion about her truthfulness as to these specific allegations—that she was not fabricating the allegations.

We also disagree with the State's contention that Detective Carrasco's testimony was admissible as an expert opinion "because it merely aided the jury in its factual determination." Expert testimony must aid, not supplant, the jury's fact-finding role. *See Schutz*, 957 S.W.2d at 70; *Yount*, 872 S.W.2d at 708. Testimony of the truthfulness of a witness's testimony or the truthfulness of allegations is inadmissible because it does more than assist the trier of fact to understand the evidence or to determine a fact in issue; it decides an issue for the jury. *Yount*, 872 S.W.2d at 709. The jurors were the ones tasked with determining whether appellant had sexually assaulted C.E. In

this case, that determination hinged on whether they believed C.E. was telling the truth.[23] It was for the jury to decide whether C.E. fabricated the allegations.

## Opinion of Appellant's Guilt

In his fifth point of error, appellant argues that the trial court erred in permitting Detective Carrasco to testify about the factors he considered in forming his opinion that appellant was guilty of this sexual assault.

It is well settled that no witness, expert or lay, is competent to voice an opinion about the guilt or innocence of a defendant. *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974); *Ex parte Skelton*, --- S.W.3d ---, 04-12-00066-CR, 2013 WL 3455583, at *6 (Tex. App.—San Antonio July 10, 2013, no pet. h.); *see DeLeon v. State*, 322 S.W.3d 375, 383 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (prosecutor's questions to detective asking who committed offenses and where last offense occurred were improper); *Huffman v. State*, 691 S.W.2d 726, 730 (Tex. App.—Austin 1985, no pet.) (trial court erred in permitting prosecutor to ask deputy sheriff if he felt crime had been committed where appellant claimed he shot victim in self defense); *see also Lovell v. State*, No. 12-04-00291-CR, 2006 WL 1916950, at *3 (Tex. App.—Tyler Nov. 22, 2006, pet. ref'd) (mem. op., not designated for publication) (trial court erred in allowing prosecutor to ask police officer whether, based on his investigation, officer believed defendant had "violated the law," as this was merely expression of opinion that officer believed defendant was guilty).

---

[23] The State acknowledged this fact in its closing argument:

> [T]his case is very simple and it boils down to what almost every single child abuse case boils down to: Do you believe that girl? Do you believe [C.E.]? It's simple. It's no more complicated than that.

41

On direct examination of Detective Carrasco, the prosecutor asked the detective directly, "And did you believe that Felix Sandoval sexually assaulted [C.E.]?" Appellant's objection to the question as "invading the providence -- the province of the jury" was sustained. Subsequently, on redirect examination of the detective, the prosecutor asked,

> Q.      Okay. So in a case -- again, not to beat a dead horse, but in a case where we have a delayed outcry, what are some of the things -- if you don't have a lot of physical evidence to look at, what are some of the things in this case that you looked at when you determined looking at the totality of the [sic] all of the things that you have to determine that you believe that this defendant had, indeed, committed the sexual assault of [C.E.]?

Appellant's counsel again objected, asserting, "Counsel is asking the witness to render an opinion which invades upon what the jury is supposed to do. And he is not, also, qualified as an expert witness in this case for that particular purpose of determining whether or not this was truthful or not." This time the trial court overruled the objection and instructed the witness that he could answer the question. After explaining the reasons for the lack of physical evidence, the detective stated,

> . . . So, basically, all I had left was [C.E.]'s account of what happened and, of course, the interview that I conducted with [appellant], which, again, there were a few things that caught my attention during the course of my interview with him.
>
> In looking back at [C.E.]'s interview and her written statement, it stayed very consistent.

By providing this answer—explaining his doubts about appellant's credibility and his belief of C.E.'s account due to consistency—in response to the particular question asked, the detective expressed his opinion that appellant was guilty. This was impermissible.

*Harm Analysis*

The erroneous admission of expert testimony is non-constitutional error. *Jessop v. State*, 368 S.W.3d 653, 678 (Tex. App.—Austin 2012, no pet.); *see Coble*, 330 S.W.3d at 280. Accordingly, any error must be disregarded unless it affected appellant's substantial rights. *Barshaw*, 342 S.W.3d at 94; *see* Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble*, 330 S.W.3d at 280. If the improperly admitted evidence did not influence the jury or had but a slight effect on its deliberations, such error is harmless. *Id.* In analyzing the erroneous admission of expert testimony, we may consider, among other things: (1) the strength of the evidence of the appellant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during arguments. *See id.* at 286–88.

Once again, we observe that though the evidence was legally sufficient, there was not overwhelming evidence supporting a finding of guilt. *See Motilla v. State*, 78 S.W.3d 352, 356–57 (Tex. Crim. App. 2002) (reiterating that "overwhelming evidence" of guilt is one consideration in deciding whether improper admission of evidence was harmful).

Next, the record reflects that the jury heard similar evidence elsewhere. The State elicited testimony concerning fabricated allegations from Melissa Rodriguez, the forensic interviewer who interviewed C.E. at the children's advocacy center. After establishing that Rodriguez had previously conducted interviews in which she concluded that the child being interviewed was not being truthful and had fabricated the allegations of abuse, the prosecutor asked about

C.E.'s interview:

> Q. Okay. Now, we had talked about there's some things that you know to look at, from your training and experience, with regard to fabricated stories or stories that a child might tell if somebody is putting them up to it in some way. Did you have any of those concerns with your interview with this young lady, [C.E.]?
>
> A. No, not at all.
>
> . . .
>
> Q. Okay. Now, when you're finished with the interview, again, you said that if you had any concerns about that at all, you would communicate those concerns to whatever agency, be it CPS or law enforcement; is that correct?
>
> A. That's correct.
>
> Q. Okay. And did you make any such report of a concern to anyone that was involved in the investigation of this case?
>
> A. No.
>
> Q. And is that because you didn't have any concern?
>
> A. There were no red flags at all.

This testimony was admitted without objection. Error in the improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."). Here, even though the "similar evidence" was the opinion of a different expert, the content was parallel. The fact that the jury heard similar expert

testimony elsewhere without objection, particularly from a witness who was explicitly offered as a child-abuse expert, mitigates the harm.[24]

Regarding the strength of the expert's opinion, we observe that Detective Carrasco's opinions were not particularly powerful. Given that he forwarded this case to the district attorney's office for prosecution after his investigation, one could logically assume that he found C.E. credible, her allegations truthful, and believed appellant was guilty of committing this sexual assault.

Finally, while the State referenced the experts' opinions concerning the truthfulness of C.E.'s allegations and appellant's guilt during closing argument, the emphasis was not on Detective Carrasco. The prosecutor argued:

> You have heard from trained, professional people who deal with these kind of cases day in and day out. They know what to look for. They've seen children lying, they've seen children being coached, and they've seen children who have been sexually abused and that's the majority of what they see.
>
> And they look -- they heard [C.E.] and they knew that he did it. With the officer, no red flags. You have that, plus you have that she was consistent. Consistency over time is a big deal. She was consistent with her oral statement to him and her written statement.

---

[24] We do not hold, or even suggest, that expert opinions are interchangeable such that the admission of one expert's opinion automatically eliminates harm in the erroneous admission of another expert's opinion merely because they opine about the same topic. Our conclusion here is based on the opinion testimony in this case and the expertise of the experts who gave it. Both of these opinions derived from the same source—C.E.'s interview (Carrasco reviewed it while Rodriguez conducted it)—and were similar in nature (both expressing the opinion that C.E. did not fabricate the allegations). However, we recognize that though similar in nature, these opinions are still distinguishable based on areas of expertise. Detective Carrasco's opinion was based on his generalized expertise as a law enforcement officer, whereas Rodriguez's opinion was based on her specialized expertise as a child-abuse expert. The strength of her opinion derives from her expertise in that particularized field and mitigates the harm of the erroneous admission of the detective's more generalized opinion. Had the situation been reversed, we cannot say that we would necessarily have found that the admission, without objection, of Detective Carrasco's opinion substantially mitigated the harm in an erroneous admission of Rodriguez's testimony.

And then she was interviewed by a forensic interviewer. And Melissa Rodriguez is one of -- she is the best. She's good at what she does and she knows what she's doing. And she told you that there were no red flags. She told you [C.E.] was telling the truth. But you didn't need her to tell you that, did you, because you saw it when you heard [C.E.]. So over and over again, trained professionals hearing from [C.E.], and knowing the truth, no red flags. Plus you have [C.E.] and that's all you need.

While this argument drew attention to the opinions of both Officer Preston and the forensic interviewer, it did not directly reference Detective Carrasco but specifically highlighted Rodriguez.

Given these particular circumstances, especially the repetition of similar, arguably stronger, expert opinions elsewhere in the trial, we conclude that the error in admitting Detective Carrasco's testimony did not, by itself, have a substantial and injurious effect on the jury's deliberations. Accordingly, we overrule appellant's fourth and fifth points of error.

## Character-Conformity Evidence

In his final two points of error, appellant argues that the trial court erred in admitting inadmissible character-conformity evidence.

### *Extraneous-Conduct Evidence*

In his eighth point of error, appellant complains that the trial court erred in admitting extraneous-conduct evidence that he inappropriately touched another child a decade before the assault at issue here. He argues that this evidence constituted inadmissible character-conformity evidence under Rule of Evidence 404(b).

At trial the State offered evidence of appellant's extraneous conduct with J.A., C.E.'s older sister.[25] J.A. testified, in general terms, that appellant was known as a "pervert" among the children in the family. She also indicated that she warned the younger girls, specifically C.E., about him. J.A. expressed her opinion that appellant "was someone who could potentially hurt children in a sexual way" because of things he had "tried" with her. She then testified about a specific

[25] The record reflects quite a bit of discussion of what evidence relating to appellant's extraneous conduct with J.A. would be allowed. The State wanted to offer three instances of appellant's conduct with J.A.: (1) touching the inside of her leg when she was alone with him in a car "when she was tiny," (2) watching her one night when she woke up, and (3) grabbing her butt cheeks and pulling her toward his genitals. The trial court addressed three areas of concern: notice, Rule 404(b) character conformity, and Rule 403 prejudice.

The defense first objected to evidence of extraneous conduct with J.A. during Detective Carrasco's testimony on notice grounds, claiming they did not receive proper notice of the State's intent to introduce such evidence. The record reflects that the State relied on a paragraph of the pretrial discovery order to provide the requisite notice. This paragraph stated, "Pursuant to Article 37.07 of the Texas Code of Criminal Procedure and Rules 403, 404 and 609, the State will offer evidence of the following extraneous conduct of the defendant at the trial of the above cause: All conduct including speech of the defendant as described within the statements and reports provided to defense counsel under this order."

From the record, it appears that the relevant notice language was contained in the offense report of the detective, which indicated that "when [J.A.] was nine or ten [appellant] tried to touch her" and the *State's Second Notice of Intent to Introduce Extraneous Offense Evidence* which stated that appellant "touched [J.A.] inappropriately when she was a child." Defense counsel complained about the adequacy of the notice, arguing that while there was the suggestion of inappropriate conduct, there was no indication of how appellant was inappropriate with her. The defense also objected that this failed to give notice of multiple instances of conduct. The State contended this was proper notice for all of the incidents of extraneous conduct they offered, arguing, "We didn't limit the times that he touched her. We said, 'You're on notice that he tried to touch her inappropriately when she was nine or ten.' . . . . We didn't say it was only one specific instance, we said, 'Nine or ten.'" When the trial court opined that "one incident does not give notice of all incidents," the prosecutor complained that the trial court was improperly limiting the evidence to the detective's summary of his review of a third-party interview of the victim. However, the trial court noted that the State had opted to rely on the pretrial order referencing that summary to provide notice. Thus, the court concluded that the State failed to provide notice beyond what was contained in the offense report. Accordingly, the trial court limited the extraneous-offense evidence to one incident of inappropriate touching.

incident that occurred in her aunt's bedroom when she was nine or ten years old.[26] According to J.A., she went into her aunt's room to look for medicine to put on a sore tooth. Appellant walked in the room and startled her so she left the room. He then called her back in to the room to ask what she had been doing. She went back in there to explain and show him her tooth, standing between his legs as he sat on the bed. J.A. testified that appellant then grabbed her butt, with one hand on each cheek, and pulled her toward him, toward his "private" area. She said that she did not remember if he looked at her sore tooth because "it was so quick." She did recall that he had a "creepy" smile on his face and said the look he gave her "wasn't the way you look at a child" but "was more serious, as if he was seeing me [as] someone much more grown up." She said that she

---

[26] Before the prosecutor elicited the details about the incident, the court granted appellant's request for a limiting instruction. The judge instructed the jury,

> Ladies and Gentlemen, you may hear evidence relating to an allegation of an extraneous offense, another offense. You may choose to consider that evidence or you may choose not to consider it. If you do choose to consider it, you may only consider it for the following reasons: intent, plan, motive, preparation or opportunity.

> Furthermore, you may only consider that extraneous offense, or alleged extraneous offense, if you believe it beyond a reasonable doubt.

The court gave a similar instruction in the jury charge regarding limited consideration of any extraneous-offense evidence:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the defendant's motive, opportunity, intent, preparation, or plan in connection with the offense alleged against him in the indictment in this case, and for no other purpose.

48

struggled out of his hold and ran out of the room.[27] J.A. testified that she never told her mom about the incident "directly" but said she made her mom aware that "[appellant] was someone you had to watch out for."

### Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Martinez*, 327 S.W.3d at 736. A trial court abuses its discretion only if its determination "lies outside the zone of reasonable disagreement." *Id.*; *Casey*, 215 S.W.3d at 879. A trial court's decision to admit evidence of an extraneous offense is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, we will uphold that decision. *Id.*

### Rule 404(b)

Texas Rule of Evidence 404(b) prohibits the admission of evidence of extraneous offenses or bad acts to prove a person's character or to show that the person acted in conformity with that character. *See* Tex. R. Evid. 404(b). However, such evidence may be admissible when it has

---

[27] Although the court limited the extraneous-conduct evidence to this one touching incident, the prosecutor initially elicited testimony that there were "at least three" instances where appellant made J.A. "feel uncomfortable." After describing the incident in her aunt's bedroom, the prosecutor, apparently misunderstanding the court's ruling, attempted to elicit testimony about another time "where [J.A. was] alerted that [appellant] had a sexual interest in [her]." Appellant's objection to lack of notice about further extraneous conduct was sustained.

49

relevance apart from character conformity. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Extraneous misconduct may be admissible for some other purpose, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Tex. R. Evid. 404(b); *Montgomery*, 810 S.W.2d at 387–88. This list is illustrative—the exceptions are neither mutually exclusive nor collectively exhaustive. *See De La Paz*, 279 S.W.3d at 343. Rebuttal of a defensive theory is one of the "other purposes" for which extraneous-offense evidence may be admitted under Rule 404(b). *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). "'Rule 404(b) is a rule of inclusion rather than exclusion.'" *De La Paz*, 279 S.W.3d at 343 (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) *solely* for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)) (emphasis added).

If a defendant objects on the grounds that the evidence is not relevant, violates Rule 404(b), or constitutes an extraneous offense, the State must show that the uncharged misconduct evidence has relevance apart from showing character. *Rankin*, 974 S.W.2d at 718 (citing *Montgomery*, 810 S.W.2d at 387); *see De La Paz*, 279 S.W.3d at 343. The mere fact that the State offers evidence for a purpose other than character conformity, or any of the other enumerated purposes in Rule 404(b), does not, in itself, make the evidence admissible. *DeLeon v. State*, 77 S.W.3d 300, 312 (Tex. App.—Austin 2001, pet. ref'd) (citing *Rankin*, 974 S.W.2d at 719).

Extraneous-offense evidence will generally be relevant, but the permissible purposes for which the State is offering it may not be.[28]  *Id.*

*Motive*

The State argued at trial that the evidence of extraneous conduct was admissible to show appellant's motive.  Although proof of motive is not a required element in criminal cases, "evidence of motive is one kind of evidence [that aids in] establishing proof of an alleged offense." *Crane v. State*, 786 S.W.2d 338, 349–50 (Tex. Crim. App. 1990).  However, for evidence of motive to be admissible, the evidence must tend to raise an inference that the accused had a motive to commit the alleged offense for which he is on trial.[29]  *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982); *Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972).  "[M]otive refers to an emotion that would provoke or lead to the commission of a criminal offense." *Rodriguez*, 486 S.W.2d at 358.  Evidence to show motive is the circumstantial evidence that would appear to cause or produce the emotion that would in turn provoke or incite the commission of the criminal offense.  *Id.*; *see, e.g.*, *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999) (evidence

---

[28]  Here, the State asserted at trial that appellant's fabrication defense brought all of the enumerated exceptions listed in Rule 404(b) into play and wanted to have all of them included in the court's limiting instruction.  The court, however, determined that the evidence did not raise all of the exceptions and concluded that a limiting instruction on the entire "laundry list" would not be appropriate.  After several discussions, the judge limited the jury's consideration to motive, opportunity, intent, preparation, and plan.

[29]  Evidence of an extraneous offense to show motive is usually required to relate or pertain to other acts by the accused against the victim of the crime for which the accused is presently being prosecuted.  *Foy v. State*, 593 S.W.2d 707, 708–09 (Tex. Crim. App. 1980); *Zuliani v. State*, 903 S.W.2d 812, 827 (Tex. App.—Austin 1995, pet. ref'd).  This Court has previously held that when, as in this case, the acts do not relate to the same victim, they are not admissible to show motive.  *See Zuliani*, 903 S.W.2d at 827.

of defendant's use of cocaine on night of murder was admissible to show defendant was motivated to kill in order to obtain money for cocaine); *Porter v. State*, 623 S.W.2d 374, 386 (Tex. Crim. App. 1981) (evidence that defendant had committed robbery 11 days earlier was relevant to show his motive for murdering police officer apprehending him).

On appeal, the State does not explain how appellant's touching J.A. on the butt when she was nine or ten years old and pulling her toward him with a creepy smile on his face produced the emotion that provoked appellant to force C.E. to have sexual intercourse with him over a decade later. We conclude there is an insufficient relationship between the extraneous conduct and the State's efforts to establish appellant's motive for committing the charged offense. *See Lopez v. State*, 288 S.W.3d 148, 165–66 (Tex. App.—Corpus Christi 2009, pet. ref'd) (evidence of extraneous acts with third party—consensual sexual activity without condom and failure to disclose HIV positive status—did not establish motive for defendant to sexually assault victim). Accordingly, we find that the extraneous acts had no relevance as to motive.

*Opportunity*

Evidence of an extraneous offense may be admissible under Rule 404(b) to rebut a defense of "lack of opportunity" or "impossibility." *See, e.g.*, *Wheeler v. State*, 67 S.W.3d 879, 887–88 (Tex. Crim. App. 2002) (extraneous offense involving another child "with family members in the immediate vicinity" admissible to rebut claim of lack of opportunity and impossibility where defense was that defendant was never alone with child victim); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001) (extraneous sexual offenses admissible in sexual abuse case where defense claimed lack of opportunity to commit offense because he was never alone with victim and many other children were always present); *Abshire v. State*, 62 S.W.3d 857, 860 (Tex. App.—Texarkana

52

2001, pet. ref'd) (extraneous-offense evidence admissible in child sexual assault case where defense was lack of opportunity and all of defendant's family members testified that he never had opportunity to commit offense in his home because no room was ever locked and people were always in position to see what transpired in house).

The issue of opportunity, or lack thereof, was not raised in this case. In fact, contrary to claiming that he lacked the opportunity, appellant arguably conceded that he had the opportunity to commit the offense when he acknowledged to the detective in the interview that he remembered the occasion when C.E. spent the night at his house that summer and recalled that his wife left the house for about 10 to 15 minutes. Thus, the extraneous conduct was not relevant to the uncontested issue of opportunity.

*Intent*

An extraneous offense may be admissible to prove the culpable mental state required for the charged offense if the required intent cannot be inferred from the act itself, or if the accused presents evidence to rebut that inference. *Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2002, no pet.); *see Prior v. State*, 647 S.W.2d 956, 959 (Tex. Crim. App. 1983); *Dunklin v. State*, 194 S.W.3d 14, 26 (Tex. App.—Tyler 2006, no pet.). However, when the State's direct evidence shows the intent element of the crime and that evidence is uncontradicted by the defendant and not undermined by cross-examination of the State's witnesses, evidence of extraneous offenses to show intent is inadmissible. *Rankin*, 974 S.W.2d at 719; *DeLeon*, 77 S.W.3d at 312.

The contested issue in this case was whether appellant had sexual intercourse with C.E. at all. C.E. testified to specific acts perpetrated by appellant that resulted in sexual intercourse. The jury could infer the required guilty intent from the act of sexual intercourse itself. *See Boutwell*

53

*v. State*, 719 S.W.2d 164, 180 (Tex. Crim. App. 1985) (intent not contested issue in sexual abuse case where act itself is indicative of such); *Bjorgaard*, 220 S.W.3d at 560 ("Simply put, the acts speak for themselves and provide [a] basis (if believed) for one to reasonably infer that appellant consciously sought to fondle [the victim's] sex organ."). Appellant neither contradicted the State's evidence nor undermined the intent element through cross-examination. He never advanced a theory suggesting the lack of intent; that is, he never suggested that he engaged in the conduct without the requisite intent. Appellant did not claim at trial, nor did the evidence suggest, that he accidentally committed this act. Rather, he denied engaging in the conduct altogether. Therefore, the inclusion of the extraneous conduct was not necessary to disprove an otherwise innocent intent. *See Clark v. State*, 726 S.W.2d 120, 124 (Tex. Crim. App. 1986) (appellant's actions in signing her own name to 22 checks made out to her employer and depositing them into her bank account showed requisite intent for theft of property and no evidence was introduced to offer any other alternative; thus, extraneous offenses were "not necessary to shore up the State's case or disprove an otherwise innocent intent"); *Lopez v. State*, 288 S.W.3d 148, 165 (Tex. App.—Corpus Christi 2009, pet. ref'd) (defendant did not claim that he accidentally committed sexual acts of penetrating victim's anus and causing victim's penis to contact his mouth; therefore, extraneous acts not necessary to disprove otherwise innocent intent). Furthermore, even if appellant had made his intent an issue at trial (e.g., by admitting to the alleged sexual intercourse while claiming the conduct was somehow accidental or unintentional), we fail to see how the particular extraneous conduct admitted here would be relevant in negating such a defense. We are unable to discern how the evidence of touching J.A. a decade earlier shows his intent to have sexual intercourse with C.E.

Moreover, the evidence of extraneous conduct lacked the requisite similarity to the charged offense. When evidence of an extraneous offense is offered to show intent, the relevance of the extraneous offense derives from the "doctrine of chances"—the instinctive recognition of that logical process which eliminates the element of innocent intent when similar instances ending in the same result recur. *Casey*, 215 S.W.3d at 881 (citing *Plante v. State*, 692 S.W.2d 487, 491–92 (Tex. Crim. App. 1985)); *Brown*, 96 S.W.3d at 513; *see De La Paz*, 279 S.W.3d at 347 ("The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance."). For the doctrine to apply, there must be a distinct similarity between the charged and extraneous offenses, since it is the improbability of a like result being repeated by mere chance that gives the extraneous offense probative weight. *Plante*, 692 S.W.2d at 492; *Brown*, 96 S.W.3d at 512; *see Casey*, 215 S.W.3d at 881 ("[E]vidence of *a remarkably similar act* might be admissible to prove . . . intent . . . under 'the doctrine of chances.'" (Emphasis added.)). Appellant's touching the butt of a ten-year-old child, over her clothing, is in no way similar to penetrating the sexual organ of a 15-year-old child with his penis.

Appellant's intent was not at issue, nor were the acts sufficiently similar. Thus, we conclude the extraneous-conduct evidence was not relevant to the issue of appellant's intent to have sexual intercourse with C.E.

*Preparation or plan*

The "preparation" or "plan" exception allows admission of evidence to show steps taken by the defendant in preparation for the charged offense. *Daggett v. State*, 187 S.W.3d 444, 451 (Tex. Crim. App. 2005); *see Boutwell*, 719 S.W.2d at 181 ("Central to the common plan or scheme exception is that there be a plan or scheme and the extraneous offenses are steps taken towards the

accomplishment of the plan."). Thus, if the proponent is unable to articulate exactly how an extraneous act tends to prove a step toward an ultimate goal or overarching plan, the evidence is not admissible to prove part of a "plan." *Daggett*, 187 S.W.3d at 452.

In the present case, the State offered J.A.'s testimony about the touching incident as evidence of a common scheme or plan to sexually assault C.E. However, the State failed to articulate any logical link between touching J.A.'s butt and an ultimate goal or plan to have sexual intercourse with C.E. a decade later. Neither preparation nor plan was an issue raised in this case. Therefore, they could not serve as a proper basis for admitting the extraneous conduct.

### *Rebuttal of a Defensive Theory*

Rebuttal of a defensive theory is one of the "other purposes" for which extraneous-offense evidence may be admitted under Rule 404(b). *Williams*, 301 S.W.3d at 687; *Moses*, 105 S.W.3d at 626. This includes rebutting the defensive theory that the complainant fabricated the allegations against the defendant. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *see Gaytan v. State*, 331 S.W.3d 218, 224 (Tex. App.—Austin 2011, pet. ref'd). If the State can show that a defendant has committed similar sexual assaults against unrelated and unconnected children, a defense allegation that the complainant fabricated her claim is less likely to be true. *See Bass*, 270 S.W.3d at 562–63. By showing that the complainant's allegations are less likely to be fabricated, the extraneous-offense evidence directly rebuts the defensive claims and has logical relevance aside from character conformity. *Id.*; *Applewhite v. State*, 08-11-00121-CR, 2012 WL 4447592, at *2 (Tex. App.—El Paso Sept. 26, 2012, pet. ref'd) (op., not designated for publication).

In the present case, the State argues that the extraneous-conduct evidence was admissible to rebut two defensive theories: fabrication and "sloppy police work." We disagree. To be admissible for rebuttal of a fabrication or "frame-up" defense, "the extraneous misconduct must be at least similar to the charged one." *Wheeler*, 67 S.W.3d at 887 n.22; *see Richardson v. State*, 328 S.W.3d 61, 71 (Tex. App.—Fort Worth 2010, pet. ref'd) ("By raising a defensive theory, a defendant opens the door for the State to offer rebuttal testimony regarding an extraneous offense if the extraneous offense has common characteristics with the offense for which the defendant is on trial."); *Blackwell v. State*, 193 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("To be probative, the extraneous-offense evidence admitted to rebut a defensive theory must be similar to the charged offense."); *see also Dennis v. State*, 178 S.W.3d 172, 179 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (holding that extraneous-offense evidence admitted to rebut defensive theory of frame-up need not be signature crime or nearly identical to charged offense; Rule 404(b) requires only similarity to charged offense). We conclude the extraneous conduct here lacks the requisite similarity to the charged offense to be admissible to rebut the defensive theory of fabrication. Touching the butt over the clothing is not sufficiently similar to penile penetration of the sexual organ that it logically serves to make it more or less probable that C.E. lied.

In addition, simply because a defensive theory is advanced does not automatically mean extraneous-offense evidence is admissible to rebut it. The evidence of extraneous misconduct must logically serve to make more or less probable defensive evidence that undermines an elemental fact. *See De La Paz*, 279 S.W.3d at 343 (citing *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005)). The extraneous-conduct evidence about the touching incident does not logically serve to make it more or less probable that law enforcement conducted an inadequate investigation in this

case. Thus, contrary to the State's contention, the evidence was not admissible to rebut the "sloppy police work" defense.

We conclude that the extraneous-conduct evidence was not admissible to rebut either the defensive theory of fabrication or "sloppy police work."

*False Impression*

At trial the prosecutor argued that the extraneous-conduct evidence was admissible to rebut appellant's assertion that he was "not a molester." On appeal, the State addresses this assertion in its argument that the extraneous-conduct evidence was admissible to rebut a defensive theory.[30] The State asserts that appellant's extraneous conduct with J.A. was admissible because extraneous offenses are admissible "when a false picture is presented by the defense" and notes that defense counsel highlighted appellant's statement that he did not molest children during his questioning of Detective Carrasco.[31]

---

[30] The State maintains in its brief that "asserting the argument 'I'm not a molester'" was one of the ways appellant presented a fabrication defense at trial.

[31] As a general rule, the defensive theory that the State wishes to rebut through the use of extraneous-offense evidence must be elicited on direct examination by the defense and may not by elicited by "prompting or maneuvering" by the State. *See Shipman v. State*, 604 S.W.2d 182, 185 (Tex. Crim. App. 1980); *Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). An exception to this general rule exists: when a defendant voluntarily or nonresponsively testifies concerning extraneous matters on cross-examination, the State may correct any false impression presented by such answer. *See Martinez v. State*, 728 S.W.2d 360, 361–62 (Tex. Crim. App. 1987); *Roberts*, 29 S.W.3d at 601. Accordingly, if a defendant testifies to a blanket statement of good conduct or character, he may "open the door" by leaving a false impression with the jury about a relevant act or character trait. *Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005). In this case, appellant did not testify at trial. Thus, he did not testify to a blanket statement of good conduct or character, through direct testimony or on cross-examination. Nor did he present such a picture through a defense witness. Rather, his statement was made during the interview with Detective Carrasco. The State offered the video of this interview into evidence. We acknowledge that during cross-examination defense counsel

Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence. *Williams*, 301 S.W.3d at 687; *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009). A party opens the door by leaving a false impression with the jury that invites the other side to respond. *Hayden*, 296 S.W.3d at 554; *Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005). Under this exception, "when a witness's blanket assertion of exemplary conduct is directly relevant to the offense charged, the opponent may both cross-examine the witness and offer extrinsic evidence rebutting the statement." *Winegarner v. State*, 235 S.W.3d 787, 790–91 (Tex. Crim. App. 2007) (quoting *Daggett*, 187 S.W.3d at 453 n.24 (internal quotation marks omitted)). More particularly, when a defense witness presents a picture that the defendant is not the type of person to commit the charged offense, the prosecution may impeach that witness's testimony by introduction of similar extraneous offenses. *Wheeler*, 67 S.W.3d at 885 (citing *McIlveen v. State*, 559 S.W.2d 815, 822 (Tex. Crim. App. 1977)); *Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see, e.g.*, *Garcia v. State*, 308 S.W.3d 62, 67–68 (Tex. App.—San Antonio 2009, no pet.) (by eliciting testimony from defendant on direct examination broadly disclaiming that he had ever sexually assaulted someone,

---

questioned the detective about appellant's "I'm not a molester" assertion when he asked about appellant's denial of the instant offense during the interview, apparently attempting to show that more happened in the interview than was elicited by the State during direct examination. However, we are troubled by the notion that appellant created a false impression at trial by making this statement during the investigation before he was charged with this offense, such that it entitled the State to offer extraneous-offense evidence to correct the impression or rebut the assertion when the State itself offered the video into evidence. However, we address the "false impression" exception because the State alludes to it in its brief, and we will uphold the trial court's evidentiary ruling if it is correct on any theory of law applicable. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

defense counsel opened door for State to cross-examine defendant and to present rebuttal evidence of extraneous offense of same character as charged aggravated sexual assault).

We are not persuaded that the false-impression exception permitted the admission of the extraneous misconduct in this case. The charged conduct in this case was penile penetration of the sexual organ. The extraneous conduct was touching the butt over clothing. The assertion of good conduct was "I'm not a molester." The extraneous conduct is not similar to the charged offense, nor does it rebut appellant's assertion that he is not a molester. The incident of touching J.A.'s butt, while perhaps inappropriate, does not demonstrate that appellant is a "molester." This conclusion is supported by the State's description of the evidence at trial and J.A.'s testimony.

The prosecutor initially said that the evidence of extraneous conduct was that appellant "tried to molest [J.A.]" and "tried to touch her inappropriately." When the court sought clarification, the prosecutor conceded that "this defendant never actually committed an offense against them. He did things to them that made them feel uncomfortable that they felt was leading up to something inappropriate."[32] Most importantly, the prosecutor admitted that "we're not claiming that he actually molested these children. They're going to come in and tell this jury why they knew he was a creep and why they knew to watch out for him." In her testimony, J.A. testified consistently with this latter description. She opined that appellant was a pervert because of instances where he "tried something" that made her "feel uncomfortable." She described the look on appellant's face when he pulled her toward him as "a smile and I didn't like it" and expressed that she was young and felt frightened.

---

[32] There is some indication in the record that the extraneous conduct may have involved "some inappropriate contact" with another child in addition to J.A., but the record does not contain any details about that alleged conduct.

This evidence, while demonstrating inappropriate conduct, does not rebut appellant's claim that he was "not a molester." Evidence that would rebut such a claim would be evidence of *actual* molestation, not conduct that made J.A. feel uncomfortable, or even frightened, but that fell short of molestation. Therefore, we conclude that this evidence was not admissible to correct a false impression or rebut appellant's assertion in the interview that he was "not a molester."

### Conclusion Regarding Extraneous Conduct

To be admissible, extraneous misconduct must be relevant for reasons other than suggesting that the appellant acted in conformance with his character. *See Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995). The incident of appellant's touching J.A.'s butt over her clothing logically served none of the non-character-conformity purposes adduced by the State and amounts to nothing more than propensity evidence. Consequently, having no relevance beyond character conformity, the extraneous misconduct was inadmissible under Rule 404(b).

### Harm Analysis

Having concluded that the trial court erred, we must now determine if the error was harmful and therefore is reversible. The erroneous admission of extraneous-offense evidence is non-constitutional error. *See Martin v. State*, 176 S.W.3d 887, 897 (Tex. App.—Fort Worth 2005, no pet.); *Johnson v. State*, 84 S.W.3d 726, 729 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see also Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005). Thus, we conduct our harm analysis under the framework for reviewing non-constitutional error previously set forth in this opinion. *See supra* pp. 32–33.

Regarding the quantum of evidence demonstrating appellant's guilt, enough was there to support conviction.[33] But since there were no witnesses to the incident save for C.E. and appellant, we cannot say that the evidence of appellant's guilt was overwhelming. Next, the error involved the introduction of evidence that was inherently inflammatory. Evidence showing the commission of extraneous misconduct is usually excluded because such evidence is inherently prejudicial, tends to confuse the issues of a case, and forces the accused to defend himself against charges which he had not been notified would be brought against him. *See Sims v. State*, 273 S.W.3d 291, 294–95 (Tex. Crim. App. 2008); *Abnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994). "By its very nature, an improperly admitted extraneous offense tends to be harmful. It encourages a jury to base its decisions on character conformity, rather than evidence that the defendant committed the offense with which he or she has been charged." *Jackson v. State*, 320 S.W.3d 873, 889 (Tex. App.—Texarkana 2010, pet. ref'd). Moreover, "[b]oth sexually related misconduct and misconduct involving children are inherently inflammatory." *Montgomery*, 810 S.W.2d at 397; *see Bjorgaard*, 220 S.W.3d at 562; *DeLeon*, 77 S.W.3d at 316.

In considering how the erroneously admitted evidence might be considered in connection with other evidence in the case, we observe that the evidence of appellant's extraneous misconduct was introduced to support J.A.'s opinion that appellant was a sexual predator.[34] The

---

[33] Again, because C.E. was under 17 years of age at the time of this offense, her testimony alone is sufficient to support appellant's conviction for this sexual assault. *See* Tex. Code Crim. Proc. art. 38.07(a), (b)(1); *Perez*, 113 S.W.3d at 838.

[34] The prosecutor introduced questions concerning appellant's extraneous misconduct with the following exchange:

Q.    Now, you have the opinion that [appellant] was someone who could potentially hurt children in a sexual way, right?

State began the presentation of its case-in-chief with the following remarks by the prosecutor in her opening statement:

> He is the [E.] family's big, ugly secret. All the children in the family knew to watch out for him. All the children in the family knew he was a pervert, and yet the adults did nothing about it.

This theme characterizing appellant as a pervert or sexual predator was presented throughout trial and was emphasized through several witnesses.[35] In addition, appellant's extraneous conduct was referenced elsewhere in the guilt-innocence phase of the trial.[36] Further, the State mentioned the

---

A.  Yes.

Q.  And did you have that opinion because of something he had tried with you?

A.  Yes.

Q.  Okay. Were there several instances that made you feel uncomfortable with this defendant?

A.  At least three.

Q.  At least three. Now, I actually want to start with the last one.

[35] For example, the State asked the investigating detective, "Were you aware, when you were conducting your investigation, as well, that [appellant] was -- he was somebody that the kids in the family knew to watch out for?" The prosecutor also asked B.E., C.E.'s cousin, "Is it fair to say that all the kids in the family knew to watch out for [appellant]?"

[36] When the prosecutor asked B.E. why she did not like appellant, B.E. explained, "Because knowing what he had done with . . . my older cousin, [J.A.] . . . ." In addition, the prosecutor asked Rosie, C.E.'s mother, "So was there any indication from any of your other daughters that he was someone who was interested in children, sexually?" and established in the follow-up question that the daughter was J.A. Also, the extraneous conduct was referenced in Rosie's written statement and the video recording of the detective's interview of appellant, both of which were offered into evidence by the State.

extraneous conduct in closing argument.[37] Thus, it cannot be said that little attention was focused on the extraneous misconduct, and this enhanced the potential for the evidence to improperly influence the jury.

Further, while the trial court instructed the jury in the jury charge to consider J.A.'s testimony only for a limited purpose, this limiting instruction did not serve to mitigate harm. If the jury did heed the trial court's admonition, the admonition itself permitted consideration of the evidence for an improper purpose. As we noted previously, an instruction that instructs a jury to consider inadmissible evidence for a limited purpose still instructs a jury to consider inadmissible evidence. *See* discussion *supra* p. 34. The extraneous conduct should not have been considered for *any* purpose.

In this case, the State sought to establish that appellant was a "pervert" who was sexually interested in children. The purpose in doing so was to show that he is the type of person who engages in sexual misconduct with children and, therefore, that he perpetrated the instant sexual assault against C.E. This is precisely the improper inference that Rule 404(b) prohibits. Invoking the concept of character conformity cannot legally be done. Because the State did so here, we cannot discount the likelihood that appellant's extraneous conduct with J.A. substantially influenced his

---

[37] When discussing Rosie's written statement, the prosecutor said:

> . . . [L]ook about mid-page: "I asked her if she knew or heard anything about him trying to touch my nieces and my other daughter at any time."
>
> "She said she had not heard anything."
>
> Well, if you remember from the chart -- and we're talking about trying to touch my nieces and my other daughter. "My other daughter." So, again, [defense counsel] may be confused, you don't need to be.

conviction. Thus, appellant was harmed by its admission. We sustain appellant's eighth point of error.

### *Sexual Interest in Children*

In his ninth point of error, appellant asserts that the trial court erred in admitting testimony of C.E.'s mother, Rosie, concerning his sexual interest in children because it constituted inadmissible character-conformity evidence.

As noted previously, preservation of error is a systemic requirement on appeal. *Ford*, 305 S.W.3d at 532. A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Wilson*, 311 S.W.3d at 473–74. To preserve an issue for appellate review, a party must timely object, stating the specific legal basis for the objection. Tex. R. App. P. 33.1(a)(1). An objection is timely if made at the earliest opportunity or as soon as the grounds for the objection become apparent. *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Gillemvaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006). If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited. *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008); *see Saldano v. State*, 70 S.W .3d 873, 889 (Tex. Crim. App. 2002) ("[T]he failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence.").

In this case, the prosecutor elicited testimony from C.E.'s mother that she had learned from her older daughter that appellant was sexually interested in children:

> Q. So was there any indication from any of your other daughters that he was someone who was interested in children, sexually?

A.     Yes.

Q.     And which daughter is that?

A.     [J.A.].

Only at that point did appellant object.  However, the grounds for objection were apparent when the prosecutor asked the improper question about Rosie's knowledge of appellant's sexual interest in children.  Appellant's objection to the complained-of evidence was untimely because it was made after not only the objectionable question was asked and answered but after the follow-up question was asked and answered as well.  Because appellant failed to timely object to the complained-of testimony, he failed to preserve error relating to its erroneous admission.  Accordingly, we overrule his ninth point of error.

## CONCLUSION

Reversible error is present throughout the record of this case.  The erroneous removal of Juror Brooks from the jury affected a substantial right of appellant's and is reversible error.  The erroneous admission of multiple hearsay statements affected a substantial right of appellant's and is reversible error.  And the erroneous admission of the extraneous-conduct evidence affected a substantial right of appellant's and is reversible error.

Moreover, even if these errors were not harmful in and of themselves, which we conclude they were, the combined effect of all the errors in this case (including the opinion testimony of Detective Carrasco) harmed appellant.  *See Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) ("[I]t is possible for a number of errors to cumulatively rise to the point where they become harmful[.]"); *see also Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988).

66

Accordingly, we reverse appellant's judgment of conviction and remand the cause to the trial court for a new trial.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin*

*Justice Goodwin joins Part I of the opinion only and concurs in the judgment.

Reversed and Remanded

Filed:   September 13, 2013

Publish