# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00045-CR

---

**Rudy Herrera Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
NO. 17-075, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Rudy Herrera Jr. of the offense of capital murder. *See* Tex. Penal Code § 19.03(a)(2). The district court rendered judgment on the verdict and sentenced Herrera to life imprisonment without parole. *See id*. § 12.31(a)(2). In two points of error on appeal, Herrera asserts that he received ineffective assistance of counsel and that the district court abused its discretion in admitting extraneous-offense evidence. We will affirm the district court's judgment.

## BACKGROUND

According to the evidence presented at trial, on the morning of August 11, 2016, a motorist discovered the nude body of Emilia Juarez in a field located off Jolley Road in Lockhart. Juarez's clothing was found near her body. An autopsy revealed that Juarez had died by strangulation, and other evidence tended to show that Juarez had been sexually assaulted

around the time of her death. The eventual suspect in the murder was Juarez's cousin, Herrera. DNA evidence collected from Juarez's shirt, her pants, and the inside of her vagina matched Herrera's DNA. In an interview with police following his arrest, Herrera admitted to engaging in sexual activity with Juarez but claimed that it was consensual. Based on this and other evidence, which we discuss in more detail below, the jury found Herrera guilty of capital murder. This appeal followed.

## DISCUSSION

### Ineffective assistance of counsel

In his first point of error, Herrera asserts that he received ineffective assistance of counsel during trial. Specifically, he contends that counsel was ineffective in failing to challenge for cause a juror who indicated that she had a bias against the defense.

#### *Standard of review*

To prevail on a claim of ineffective assistance of counsel, an appellant must show: (1) deficient performance, i.e., counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) prejudice, i.e., a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018); *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). On review, an appellant has the burden to establish both *Strickland* prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956-57 (Tex. Crim. App. 1998). "An appellant's

failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

"An ineffective-assistance claim must be 'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped" as to the reasons for counsel's decisions. *Id*. "Trial counsel 'should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'" *Id*. (quoting *Goodspeed*, 187 S.W.3d at 392). "If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it." *Id*. (quoting *Goodspeed*, 187 S.W.3d at 392).

*Analysis*

During jury selection, a member of the venire indicated that that she had been the victim of a sexual assault. The State then elicited the following additional information from the venireperson:

> [Prosecutor]:       Okay. How long ago was that?
>
> [Venireperson]:     It's been a long time. It's been 25 years.
>
> [Prosecutor]:       Okay. And that's difficult. I understand. Let me ask this. Is the fact that that occurred to you in the past would you in any way hold that against Mr. Herrera?

3

|  |  |
|---|---|
| [Venireperson]: | Possible.  When I read it, right away I got a feeling, you know, it would bring back memories. |
| [Prosecutor]: | It's uncomfortable. |
| [Venireperson]: | Very. |
| [Prosecutor]: | I understand. |
| [Venireperson]: | Definitely biased. |

The State then moved on to another venireperson.  Herrera claims that "neither the trial court nor trial counsel posed any follow-up questions to [the venireperson] and that [she] was ultimately impaneled to serve as a member of the jury without any challenge from Mr. Herrera's trial counsel."

As an initial matter, Herrera is incorrect in his assertion that trial counsel failed to ask any follow-up questions of the venireperson.  The record reflects that after each side had conducted their voir dire, trial counsel identified the venireperson as a possible challenge for cause, due to her "bias with regard to being a victim of crime."  The district court then brought the venireperson to the bench for additional questions:

|  |  |
|---|---|
| [The court]: | All right. Based on your answers, we've got a couple of—the attorneys have a couple follow-up questions for you. |
| [Venireperson]: | Okay. |
| [Trial counsel]: | I believe that in—my apologies if my notes are incorrect.  But I think that the question |

4

|                   |                                                                                                                                                                                                                                                                                                                      |
| ----------------- | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                   | was posed as to whether or not prior experience with violent crime would affect your ability to be fair and impartial on this case. And I don't know if you came to a final answer at the time.                                                                                                                        |
| [Venireperson]:   | Well, to be honest I have been thinking about that. And this crime did happen when I was 9. So it's like not—I didn't put myself in that position or anything like that. You understand what I mean? So but I mean if I had to trial—if I had to be a juror, I could be fair about it.                                    |
| [Trial counsel]:  | Okay. Is there anything else?                                                                                                                                                                                                                                                                                         |
| [Venireperson]:   | No.                                                                                                                                                                                                                                                                                                                   |
| [Trial counsel]:  | Anything else that would keep you from being a fair and impartial juror on this case?                                                                                                                                                                                                                                 |
| [Venireperson]:   | No.                                                                                                                                                                                                                                                                                                                   |
| [Trial counsel]:  | Okay.                                                                                                                                                                                                                                                                                                                 |
| [Prosecutor]:     | No questions.                                                                                                                                                                                                                                                                                                         |
| [The court]:      | Thank you, ma'am. You may take a break in the hallway.                                                                                                                                                                                                                                                                |
| [Venireperson]:   | Thank you.                                                                                                                                                                                                                                                                                                            |
| [Trial counsel]:  | No challenge.                                                                                                                                                                                                                                                                                                         |

Thus, contrary to Herrera's contention, trial counsel asked follow-up questions of the venireperson, and the venireperson indicated in her answers that she could be fair and impartial.

5

Moreover, it is well established that an appellate court should not declare trial counsel ineffective for failing to challenge a juror for cause in the absence of a record demonstrating the reasons for counsel's decision. *See State v. Morales*, 253 S.W.3d 686, 696–98 (Tex. Crim. App. 2008); *Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994); *Delrio v. State*, 840 S.W.2d 443, 446–47 (Tex. Crim. App. 1992); *Notias v. State*, 491 S.W.3d 371, 377–78 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Hebert v. State*, 489 S.W.3d 15, 22–23 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also Smith v. State*, No. 03-07-00392-CR, 2009 Tex. App. LEXIS 5468, at *7–12 (Tex. App.—Austin July 14, 2009, pet. ref'd) (mem. op., not designated for publication). "Decisions relating to challenging prospective jurors for cause or striking prospective jurors are strategic and tactical," *Hebert*, 489 S.W.3d at 23, and in the face of a silent record, "we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he 'made all significant decisions in the exercise of reasonable professional judgment,'" *Delrio*, 840 S.W.2d at 447 (quoting *Strickland*, 466 U.S. at 690). There is nothing in this record to overcome that presumption. Trial counsel questioned the venireperson as to her bias and elicited responses from the venireperson indicating that she could be fair and impartial. Only then did he decide not to challenge her for cause. We cannot conclude that this decision fell below an objective standard of reasonableness.

We overrule Herrera's first point of error.

**Extraneous-offense evidence**

One of the State's witnesses at trial was Herrera's ex-wife, Shannon Orozco. The State asked Orozco questions relating to Herrera's drug use, including cocaine and methamphetamines. During Herrera's cross-examination of Orozco, trial counsel asked her if

6

Herrera's drug use was "the reason" that she had divorced him. Orozco answered, "Drugs and alcohol." On redirect examination, the State asked Orozco if there was "another reason," in addition to drugs and alcohol, that she had divorced Herrera. Orozco answered, "Yes." The State then approached the bench and informed the district court that it wanted to ask Orozco if she had divorced Herrera because Herrera had been physically abusive toward her. The State also wanted to inquire into a specific instance when Herrera had assaulted Orozco. Herrera objected to the State "going into any of these matters." The State responded that Herrera had "opened the door" to this evidence by asking Orozco why she had divorced Herrera. The district court overruled Herrera's objection but prohibited the State from "go[ing] in[to] any details" regarding the abuse. Orozco then testified as follows:

> Q. [Trial counsel] asked you . . . if the . . . the reason you divorced him [was] due to his drug and alcohol abuse; correct?
>
> A. Correct.
>
> Q. And your answer was yes?
>
> A. Correct.
>
> Q. Now, was drug and alcohol abuse the only factor that led to you divorcing Mr. Herrera?
>
> A. No, sir.
>
> Q. Ms. Orozco, was physical abuse or domestic violence a factor that led you to divorce Mr. Herrera?

7

A.    Yes, sir.

Q.    And was this physical abuse or these ongoing threats and domestic violence a single occurrence or an ongoing situation with Mr. Herrera?

A.    There were several instances.

The State elicited no further testimony on this issue. In his second point of error, Herrera asserts that the district court abused its discretion in admitting this evidence.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016); *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless it "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93; *Sandoval*, 409 S.W.3d at 297.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with [his] character." Tex. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. R. 404(b)(2). Moreover, evidence that is otherwise inadmissible under Rule 404(b) may become admissible when a party opens the door to such

8

evidence. *Williams*, 301 S.W.3d at 687 (citing *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009)). "A party opens the door by leaving a false impression with the jury that invites the other party to respond." *Hayden*, 296 S.W.3d at 554.

Here, trial counsel asked Orozco if Herrera's drug use was "the reason" that she had divorced him. It would not have been outside the zone of reasonable disagreement for the district court to have found that by asking this question, counsel had left the jury with the impression that Herrera's drug use was the sole reason for the divorce. However, Orozco testified that there was another reason, and the district court would not have abused its discretion in finding that Herrera had opened the door to testimony from Orozco identifying that other reason.

Moreover, even if the district court should not have admitted this evidence, we cannot conclude on this record that Herrera was harmed by its admission. "The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (citing *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008)). "Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights." *Id.* (citing Tex. R. App. P. 44.2(b)). The Court of Criminal Appeals has construed this to mean that "an error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Taylor*, 268 S.W.3d at 592). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Id.* "In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the

State emphasized the complained of error." *Id*. (citing *Motilla v. State*, 78 S.W.3d 352, 356-58 (Tex. Crim. App. 2002)).

Initially, we observe that the extraneous-offense evidence was limited in scope. The State asked Orozco only two questions relating to the abuse: (1) whether the abuse was a "factor" that led her to divorce Herrera; and (2) whether the abuse was "a single occurrence or an ongoing situation." To the first question, Orozco answered, "Yes." To the second question, Orozco answered, "There were several instances." Orozco provided no details, and the State elicited no further testimony on the matter.

Moreover, there was ample evidence supporting the jury's verdict in this case. Juarez's nude body was discovered in a field under circumstances that investigating officers testified were consistent with sexual assault. Her neck was badly bruised, indicating that she had been strangled by some form of ligature, and her clothes were strewn on the ground near her body. Herrera's DNA was found on Juarez's shirt, on the waistband and ankle areas of her pants, and in her vagina. Moreover, Herrera provided two statements to the police that were admitted into evidence and played for the jury. In the first statement, Herrera claimed that he did not know Juarez well and that the last time he had seen her was at an H.E.B. parking lot four or five days before her murder. In the second statement, taken following Herrera's arrest, he admitted to having a sexual relationship with Juarez and being with her the night that she was killed. During this interview, Herrera provided inconsistent accounts of the clothing that Juarez was wearing that night, the time when he had met up with her, and the extent of their sexual relationship. For most of the interview, Herrera claimed that they had oral sex only and he denied putting his penis inside her vagina. However, at one point during the interview, he admitted to putting his penis inside her vagina on one occasion (although he claimed not all the

10

way inside). As the interviewing officer explained, "[Herrera] never gave a straight answer. First it was yes. And then it was no. And then it was maybe. And then it was no again." Also during the interview, Herrera provided details of how Juarez was strangled, claiming that Juarez's family members had told him this information. However, the interviewing officer testified that at that time, no such details had been given to the family. Additionally, Herrera's timeline of when he had been with Juarez on the night of her murder conflicted with the accounts of multiple witnesses who had been with Juarez at the same time. Herrera claimed that he had been with Juarez sometime between 4:30 p.m. and 9:00 p.m. that night. However, friends and family members testified that they were with Juarez during that time, and Juarez's father had seen her at home at 1:30 a.m. before he went to bed. Thus, as the State emphasized in its closing argument, either Herrera was lying about that night or Juarez's family and friends were.

Finally, the State did not mention the extraneous-offense evidence in its closing argument. Instead, the State emphasized the DNA evidence, Herrera's statements to the police, and the timeline of events on the night of Juarez's murder. On this record, we have a fair assurance that the admission of the extraneous-offense evidence, even if erroneous, did not influence the jury or had but a slight effect.

We overrule Herrera's second point of error.

## CONCLUSION

We affirm the district court's judgment of conviction.

11

_____

                                 Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed:  April 22, 2020

Do Not Publish

12